# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DANIELLE L. GREGORY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| S. A. (Minor Child), CHILD IN NEED OF ) | **FILED** |
| SERVICES ) | Aug 15 2014, 10:25 am |
| ) | |
| And ) | *[signature]* |
| ) | **CLERK** |
| M. H. (Father), ) | of the supreme court, court of appeals and tax court |
| ) | |
| Appellant-Respondent, ) | |
| ) | |
| vs. ) | No. 49A02-1402-JC-74 |
| ) | |
| THE INDIANA DEPARTMENT OF ) | |
| CHILD SERVICES, ) | |
| ) | |
| Appellee-Petitioner. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable Diana Burleson, Magistrate
Cause No. 49D09-1306-JC-16347

**August 15, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, M.H. (Father), appeals the trial court's Order continuing the adjudication of his minor child, S.A. (the Child), as a Child in Need of Services (CHINS).

We reverse.

ISSUE

Father raises two issues on appeal, one of which we find dispositive and restate as follows: Whether the trial court erred in adjudicating the Child as a CHINS.

FACTS AND PROCEDURAL HISTORY

A.A. (Mother)[1] and Father have a son together, the Child, born on August 18, 2011, in Indianapolis, Indiana. Father spent the first two years of the Child's life serving on active duty in the United States Navy. Although Father was present for the Child's birth, he did not establish paternity until after the commencement of the CHINS proceedings at the center of this case. When Father was discharged from the Navy at the end of 2013, he had seen the Child only one other time since birth. Father concedes that he has never paid any child support or otherwise furnished any items for the Child's care.

---

[1] Mother is not a party to this appeal. Facts relating to Mother are included where appropriate.

On June 22, 2013, the Indiana Department of Child Services (DCS) received a report of child neglect involving Mother and the Child. The reporting party alleged, in part, that Mother's habitual heroin use prevented her from adequately caring for the Child and, as a result, the Child's maternal grandmother (Grandmother) had taken the Child into her home. In particular, the report conveyed that Mother used heroin in the Child's presence; that she and her boyfriend, A.S., were living in a motel; that Mother and A.S. have a violent relationship; and that the Child has scars on his hands from cigarette burns.

That same day, DCS commenced its investigation by visiting Grandmother's home to see the Child and to interview Grandmother. Grandmother informed DCS that she and the Child's step-grandfather were seeking temporary guardianship over the Child. On June 25, 2013, DCS interviewed Mother, who eventually admitted that she had been using heroin for two years but denied the allegations that she used heroin in the Child's presence and that her relationship with A.S. was violent. Because the Child was already living with Grandmother, DCS did not take the Child into its custody. Having no information about the Child's alleged Father other than his name, DCS attempted to contact him through the social media website Facebook.

On June 27, 2013, the trial court authorized DCS to file a petition alleging the Child to be a CHINS. In addition to details about Mother's extensive drug use and lack of stable housing, DCS supported its CHINS petition by claiming that the Child's "alleged [F]ather . . . has not successfully demonstrated the ability and willingness to appropriately parent his [C]hild, and his whereabouts are currently unknown."

3

(Appellant's App. p. 25). That same day, the trial court held a joint detention and initial hearing and found that the Child's removal from Mother's custody "was necessary to protect the [Child]." (Appellant's App. p. 37). The trial court granted temporary wardship of the Child to DCS and ordered that the Child be placed with Grandmother. Father was not present at the initial hearing. Mother explained that she had not seen Father for more than a year and was unaware of his whereabouts. The trial court directed DCS to serve Father or publish notice prior to the next hearing.

On July 19, 2013, the trial court resumed the initial hearing. Father did not appear. Although it is unclear whether DCS was able to serve Father with notice of the hearing, it is apparent that Father somehow became aware of the CHINS proceedings because on July 25, 2013, he filed a motion with the court requesting "scientific paternity testing." (Appellant's App. p. 55). In his motion, Father explained that he was stationed in Corpus Christi, Texas, and requested that he be permitted to appear at future proceedings telephonically. On August 2, 2013, the trial court conducted a third initial hearing. Father appeared by telephone and requested the assistance of counsel. Accordingly, the trial court entered a denial of the allegations raised in the CHINS petition on Father's behalf and appointed a public defender to represent him. Also at this time, the trial court granted Father's motion to establish paternity, ordering Father, Mother, and the Child to undergo DNA testing.

On September 13, 2013, DCS and Mother submitted an agreement to the court in which Mother admitted to certain allegations raised in the CHINS petition. Pursuant to

4

this agreement, the trial court adjudicated the Child to be a CHINS. The trial court then held a dispositional hearing and ordered Mother to participate in DCS-recommended services. Also, having considered, in part, "the alternatives for the care, treatment, rehabilitation, or placement of the [Child,]" the trial court ordered that the Child's placement remain with Grandmother as it "[l]east interferes with family autonomy." (Appellant's App. pp. 84, 86). Because the results of the DNA testing were not available at this time, the trial court rescheduled the proceedings relating to Father.

Father's paternity to the Child was conclusively established on November 4, 2013. At a hearing on November 15, 2013, Father's attorney appeared on his behalf and requested a fact-finding hearing. Father's attorney also conveyed Father's desire to be granted custody of the Child. The trial court set the matter for a fact-finding hearing and granted Father supervised parenting time.

At the end of November 2013, Father was discharged from the Navy. He subsequently moved in to his parents' home in Indianapolis and obtained employment with the United Parcel Service. Upon his return to Indianapolis, Father also contacted DCS and the Child's court appointed special advocate (CASA) regarding the CHINS proceedings. Every day thereafter, Father spent time with the Child at Grandmother's house. DCS did not observe any of these visits, but Grandmother reported to DCS that, with the exception of some nervousness and difficulty with diaper changing, Father "interacts well with [the Child]." (Transcript p. 21).

5

The day before the fact-finding hearing, on December 19, 2013, Father attended a Child and Family Team Meeting with DCS and the CASA. There, Father disclosed that he had been diagnosed and treated for post-traumatic stress disorder (PTSD) while on active duty. According to Father, he was hospitalized for four months at University Behavioral Health in Denton, Texas, because he "was having difficulty sleeping, [] couldn't cope with [his] emotions, [and] was dealing with extreme depression." (Tr. p. 38). Father explained that after he was released from the hospital in May of 2013, he briefly continued to attend counseling but was no longer receiving treatment.

On December 20, 2013, the trial court held a fact-finding hearing. During the hearing, DCS and the CASA recommended that the trial court continue the Child's CHINS adjudication. Both testified about their concerns regarding the Child's unfamiliarity with Father, as well as Father's lack of prior parenting experience. In addition, based upon Father's revelation that he had been treated for PTSD, DCS and the CASA agreed that Father should undergo a psychological evaluation. At the close of the evidence, the trial court acknowledged that Father's inability "to care for the [C]hild" was due to his out-of-state military service. (Tr. p. 55). Nevertheless, the trial court criticized Father for his failure to establish paternity "a lot sooner" and also expressed its concern that Father could not precisely recall when he had been released from his PTSD treatment program. (Tr. p. 55). Moreover, the trial court emphasized Mother's near-completion of her services and explained its preference that the Child eventually be released to Mother.

6

Accordingly, the trial court issued written findings in support of its decision to "continue[] the adjudication that [the Child] is a [CHINS]." (Appellant's App. p. 119).

On January 10, 2014, the trial court conducted Father's dispositional hearing. Based on DCS' recommendation, the trial court ordered Father to complete a parenting assessment and comply with any subsequent recommended services. The trial court additionally ordered Father to submit documentation regarding his treatment for PTSD or, alternatively, to undergo a psychological evaluation.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. *In re Des.B.*, 2 N.E.3d 828, 835-36 (Ind. Ct. App. 2014). In reviewing a CHINS determination, our court does not reweigh evidence or assess witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences derived therefrom. *Id.*

In addition, the trial court entered limited findings of fact and conclusions thereon *sua sponte*; thus, our review is governed by Indiana Trial Rule 52(A). The CHINS statute does not stipulate that formal findings must accompany a CHINS determination. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Accordingly, for the issues covered by the court's findings, we apply our two-tiered standard of review, first considering whether the evidence supports the factual findings and then whether those findings support the

7

trial court's judgment. *Id.* We will not set aside the findings or judgment unless they are clearly erroneous. *In re Des.B.*, 2 N.E.3d at 836. Factual findings are clearly erroneous where there are no facts in the record to support them either directly or by inference. *Id.* "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id.* We accord substantial deference to the trial court's findings of fact but not to its conclusions of law. *Id.* Any issues not covered by the trial court's findings are reviewed under the general judgment standard, "under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287 (internal quotation marks omitted).

## II. *CHINS Adjudication*

Father claims that the trial court erred in continuing the Child's adjudication as a CHINS. The Fourteenth Amendment to the United States Constitution protects the "fundamental right to family integrity" against unwarranted government intrusion. *In re T.H.*, 856 N.E.2d 1247, 1250 (Ind. Ct. App. 2006). This protection encompasses parents' fundamental right to "direct[] the care, custody, and control of their children." *In re V.H.*, 967 N.E.2d 1066, 1071 (Ind. Ct. App. 2012). However, a parent's rights are not absolute. Acting under its *parens patriae* power, the State may interfere with parental autonomy when it is "necessary to protect the health and safety of children." *Id.* at 1072. The purpose of the CHINS statute is "to help families in crisis—to protect children, not punish parents." *In re S.D.*, 2 N.E.3d at 1285.

In a CHINS proceeding, which is a civil action, DCS bears the burden of proving three statutory elements by a preponderance of the evidence. *In re K.D.*, 962 N.E.2d at 1253. Here, because DCS alleged the Child to be a CHINS under the neglect statute, DCS must establish that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> (2) the child needs care, treatment, or rehabilitation that:
>    (A) the child is not receiving; and
>    (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. The third element of a CHINS adjudication is that the Child must be less than eighteen years of age, which is not disputed in the case at hand. I.C. § 31-34-1-1. The CHINS statute is intended to protect children who are "endangered by parental action or inaction"; a court need not "wait until a tragedy occurs" to intervene." *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

On appeal, Father specifically contends that the record is devoid of evidence or findings by the trial court to support the conclusion that the Child's "mental or physical condition continued to be seriously impaired or seriously endangered as a result of the inability, refusal, or neglect *of Father* to supply . . . him with necessary food, clothing, shelter, medical care, education, or supervision." (Appellant's Br. p. 13 (emphasis

9

added)).  Although raised by neither party, Father's argument prompts us to first address some procedural irregularities and their impact on Father's due process rights.[2]

## A.  *CHINS Procedure*

Three months after the trial court adjudicated the Child to be a CHINS based on Mother's admission, the trial court held a fact-finding hearing and found the Child to be a CHINS "as to [F]ather" based on the allegations in DCS' initial petition.  (Appellant's App. p. 109).  As our supreme court has established, "a separate analysis as to each parent is not required" in making a CHINS determination because a CHINS adjudication reflects the status of a child without establishing the culpability of a particular parent.  *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010).  A CHINS adjudication is simply a determination that a child is in need of services and is unlikely to receive those services without the court's intervention; it is not a determination of parental fault.  *Id.* at 105.  It is well established that a child may be found a CHINS based on the action or inaction of both parents or only one parent, or even where neither parent has committed any wrongdoing.  *See In re K.D.*, 962 N.E.2d at 1255.  Therefore, Mother's admitted drug use *could be* a sufficient basis for the CHINS adjudication notwithstanding Father's initial contribution to the Child's neglect.  *See In re J.L.*, 919 N.E.2d 561, 564 (Ind. Ct. App. 2009).  However, our analysis does not end here.

---

[2] In general, our court refrains from considering an issue that has not been raised by a party on appeal. Yet, our court has previously acted *sua sponte* to remedy a blatant error that served to deny a criminal defendant's fundamental due process.  *See Spaulding v. State*, 533 N.E.2d 597, 603 (Ind. Ct. App. 1989), *trans. denied*.  Even though there are fundamental liberty interests at stake in a CHINS case, we recognize that there are different standards governing criminal proceedings and civil actions; therefore, we will address the due process issue, but we resolve this case on other grounds.

Two years after *In re N.E.* made it clear that a Child is not separately adjudicated a CHINS as to each parent, our supreme court clarified in *In re K.D.*, 962 N.E.2d at 1256, that a separate analysis "is sometimes necessary" if allegations have been made against both parents, and where one parent wishes to admit that the child is a CHINS while the other denies it. A CHINS adjudication requires that DCS prove each of the elements in the CHINS statute, and "each parent has the right to challenge those elements." *Id.* at 1254. Thus, while Father might not be able to dispute the factual allegations admitted by Mother, "he has the right to contest the allegation that his [C]hild needs the coercive intervention of the court." *Id.* at 1257. In these situations, due process requires that the trial court "conduct a fact-finding hearing as to the entire matter." *Id.* at 1259. Here, although Father did, in fact, receive a fact-finding hearing, the trial court had already determined the Child's CHINS status based solely on Mother's admission— notwithstanding the fact that Father was involved in the case and had denied the allegations in the CHINS petition. Because a court cannot issue separate adjudications for each parent, the trial court's CHINS determination should be based on a consideration of the evidence in its entirety. Accordingly, by adjudicating the Child as a CHINS prior to Father's fact-finding hearing, we find that the trial court deprived Father of a *meaningful* opportunity to be heard.

Moreover, after a CHINS adjudication, the trial court must conduct a dispositional hearing to consider alternatives for the Child's "care, treatment, rehabilitation, or placement"; the necessity of a parent's participation in various services; and the parent's

11

financial responsibility for said services. I.C. § 31-34-19-1(a). Following the hearing, the trial court is required to issue a dispositional decree that

> (1) is:
>   (A) in the least restrictive (most family like) and most appropriate setting available; and
>   (B) close to the parents' home, consistent with the best interest and special needs of the child;
> (2) least interferes with family autonomy;
> (3) is least disruptive of family life;
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

I.C. § 31-34-19-6. Furthermore, the dispositional decree must be accompanied by

> written findings and conclusions upon the record concerning the following:
> (1) The needs of the child for care, treatment, rehabilitation, or placement.
> (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.
> (3) Efforts made, if the child is a child in need of services, to:
>   (A) prevent the child's removal from; or
>   (B) reunite the child with;
>   the child's parent, guardian, or custodian in accordance with federal law.
> (4) Family services that were offered and provided to:
>   (A) a child in need of services; or
>   (B) the child's parent, guardian, or custodian;
>   in accordance with federal law.
> (5) The court's reasons for the disposition.

I.C. § 31-34-19-10(a).

The trial court conducted two dispositional hearings following the CHINS adjudications as to each parent. After Father's dispositional hearing, the trial court issued a parental participation order requiring Father to complete a parenting assessment and

12

possibly a psychological evaluation. However, the trial court did not issue a dispositional decree or written findings reflecting its consideration of the statutory factors. The trial court simply ordered that Father's participation is necessary for the Child's care plan.

"[E]very CHINS proceeding 'has the potential to interfere with the rights of parents in the upbringing of their children.'" *In re T.N.*, 963 N.E.2d 467, 469 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d at 108). As such, procedural irregularities "may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights." *In re N.E.*, 919 N.E.2d at 108. In order to balance the interest of parents in controlling the upbringing of their children against the State's legitimate interest in safeguarding children from the harms of neglectful parents, "the trial court needs to carefully follow the [statutory] language and logic laid out by our legislature." *Id.* By failing to issue a dispositional decree that specifically addressed, in part, its bases for placing the Child with Grandmother rather than Father and for ordering participation in services seemingly unrelated to the allegations in DCS' petition, the trial court violated the mandates of Indiana code sections 31-34-19-6 and 31-34-19-10, and "may well have interfered with Father's rights in the upbringing of [the Child]." *Id.* Nevertheless, because Father did not raise an argument of procedural error, we will now address his argument regarding the sufficiency of the evidence, notwithstanding our finding that the trial court's CHINS adjudication was contrary to due process.

B. *Sufficiency of the Evidence*

13

In addition to Mother's conduct, DCS also alleged the Child to be a CHINS because Father failed to "successfully demonstrate[] the ability and willingness to appropriately parent his [C]hild, and his whereabouts are currently unknown." (Appellant's App. p. 25). As previously discussed, Father lacks the first-hand knowledge necessary to contest the factual allegations admitted by Mother. However, he still may challenge that the coercive intervention of the court is unnecessary to ensure that the Child receives the appropriate care. *See In re K.D.*, 962 N.E.2d at 1256. To this end, Father asserts that

> [t]here was no evidence or any findings that [the Child] required protection that Father could not provide. [The Child] was removed from Mother's care due to her illegal substance abuse issues and Father's unavailability. By the time of the fact finding hearing, [the Child] had still not returned to Mother's care. Father appeared and expressed an ability and willingness to parent [the Child], and Father demonstrated his ability to provide for [the Child's] basic needs.

(Appellant's Br. p. 16 (internal citations omitted)). In this case, the trial court identified two primary concerns for finding that the Child is in need of services that he will be unlikely to receive without the court's coercive intervention: (1) Father's disinterest in establishing paternity and supporting his Child and (2) Father's history of PTSD.

### 1. *Prior Non-Involvement*

In its factual findings, the trial court relies on the recommendations of DCS and the CASA in favor of a CHINS adjudication. In particular, DCS and the CASA both testified that the court's coercive intervention was necessary based on Father's lack of prior parental involvement and parenting skills. According to the CASA, Father needed

14

parenting skills classes because "anybody that has never had a child needs some sort of level of training to help them know what to do, like some of the questions that he couldn't answer." (Tr. p. 41). DCS added that the Child "still doesn't know [Father] that well." (Tr. p. 21).

The trial court found that Father was not "physically unable" to care for the Child; rather, his inability to parent the Child was the result of his out-of-state military assignment. (Tr. p. 55). Father does not dispute the trial court's findings that he did not establish paternity until after the CHINS petition was filed and that he never offered any support, financial or otherwise, for the Child's care while serving in the military. Father's first meaningful contact with the Child was not until the Child was two years old—just a few weeks before the fact-finding hearing. Nonetheless, Father maintains that he is now employed and in a position where he can care for and support the Child.

DCS asserts that Father's argument amounts to a request that we reweigh the evidence. According to DCS, the trial court appropriately accorded more weight to the uncontroverted evidence that Father—despite his recent efforts—"had *never* taken care of [the] Child and had only seen him *twice* before." (DCS' Br. p. 18). It is well established that "a CHINS adjudication may not be based solely on conditions that no longer exist. The trial court should also consider the parents' situation at the time the case is heard." *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013) (internal citation omitted). By the time of the fact-finding hearing, Father had been discharged from the Navy, had moved back to Indianapolis, and had secured employment. The trial court also found that Father

had contacted DCS and the CASA as soon as he returned to Indianapolis and began developing a relationship with the Child. The record further demonstrates that Father filed a motion for paternity testing upon learning of the CHINS petition, and he prepared a bedroom for the Child at his parents' home. In addition, Father stated that he plans to stay with his parents—where the Child is welcome—until he saves enough money to purchase his own home. Father also testified:

> I believe that I can take [care] of [the Child] today[] because we get along amazing, I have an amazing support group, like I said there is [Grandmother and the Child's step-grandfather], there's [Mother], there's my mother, there's my father, there's my grandmother, there's my sister in addition to myself and, and, maybe for the first [two] visits I was nervous around [the Child] because he was a child, he was my child but that is not how I feel anymore and yes I'm slower at putting on his diapers and yes I'm slower at putting on his [pajamas] but I get [t]hem on all the same and he doesn't mind.

(Tr. pp. 51-52).

Our supreme court has established that the State's intrusion into parental rights should be limited to instances "where parents lack the *ability* to provide for their children, not merely where they encounter *difficulty* in meeting a child's needs." *In re S.D.*, 2 N.E.3d at 1287 (internal quotation marks omitted). DCS does not satisfy its burden of proof by simply highlighting Father's shortcomings as a parent; rather, DCS must establish that Father is unlikely to meet the Child's needs absent coercive court intervention. Neither the trial court's findings nor the other evidence in the record supports such a conclusion. If it were sufficient for the purposes of CHINS adjudications that a parent has no prior parenting experience or training, then *all* new parents would

16

necessarily be subject to DCS intervention. Here, Father resolved the allegations raised in the CHINS petition by the time of the fact-finding hearing—he was present in Indianapolis and willing to parent his Child.

## 2. *PTSD Diagnosis*

DCS and the CASA also proffered "safety" concerns stemming from Father's PTSD diagnosis as supporting the need for a CHINS finding. (Tr. p. 41). We first note that the issue of Father's PTSD was not raised in the CHINS petition as a basis for DCS involvement. Instead, after Father disclosed his diagnosis, DCS relied upon it as a *post hoc* justification for coercive intervention and now maintains that "[t]he record is clear that the court still had concerns that Father's mental health issues posed a problem to Father's ability to parent [the] Child." (DCS' Br. p. 20). At the close of the fact-finding hearing, the trial court stated that it was "not convinced that [Father's] PTSD is under control" because when asked about his release date from the hospital, Father answered "I would guess in May." (Appellant's App. p. 119; Tr. p. 56).

We find Father's voluntary admission of his PTSD history to DCS and the CASA to be indicative of the fact that court intervention would not be necessary to compel Father into treatment. Father testified that he successfully completed the PTSD treatment program in the military ward of a behavioral health hospital, and he continued to see a counselor after his release until it was no longer necessary. Father also testified that part of his treatment regime was learning how to "understand[] when you have warning signs of things going awry." (Tr. p. 51). Although it was certainly within the discretion of the

17

trial court to discredit Father's testimony, we find no other basis in the record to support the trial court's conclusion that even if Father requires additional PTSD treatment, he is unlikely to obtain such treatment without coercive intervention. *See In re K.D.*, 962 N.E.2d at 1256 ("Speculation is not enough for a CHINS finding.").

## CONCLUSION

Based on the foregoing, we conclude that the trial court erred in adjudicating the Child to be a CHINS.

Reversed.

MATHIAS, J. and CRONE, J. concur