## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 13 2015, 8:58 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Daniel A. Dixon
Lawrence County Public Defender Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Indiana Attorney General

Robert J. Henke
Deputy Attorney General

David Dickmeyer
Deputy Attorney General
Indianapolis, Indiana

Darlene Steele McSoley
Bedford, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of X.M. and D.M., Minor Children, Children Alleged to be in Need of Services,

S.B.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

February 13, 2015

Court of Appeals Cause No. 47A01-1409-JC-415

Appeal from the Lawrence Circuit Court, The Honorable Andrea K. McCord, Judge; The Honorable James F. Gallagher, Referee

Cause Nos. 47C01-1404-JC-93 and 47C01-1404-JC-94

**Najam, Judge.**

## Statement of the Case

S.B. ("Mother") appeals the juvenile court's determination that her two children, X.M. and D.M., were children in need of services ("CHINS").[1] She presents one issue for our review, namely, whether the juvenile court committed clear error[2] when it found that X.M. and D.M. were CHINS.

We affirm.

## Facts and Procedural History

On April 9, 2014, officers with the Bedford Police Department contacted the Indiana Department of Child Services ("the DCS") regarding the "neglect" of three-year-old X.M. and two-year-old D.M. Appellant's App. at 10. Prior to the call, Officers Brian Duffy and Eddie Allen had been dispatched to Mother's home on a report that two runaway teenagers, who had stolen several items, including a gun, were located there.[3] Officer Allen went around to the back of the residence, and, when Officer Duffy knocked on the front door of Mother's

---

[1] Father is in prison and does not participate in this appeal.

[2] The parties spend some time in their briefs discussing whether the Department of Child Services proved by a preponderance of the evidence that the children in question are in need of services. *See, e.g.*, *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014). This, however, is a trial-level burden of proof and does not reflect our standard of review. We focus on the juvenile court's judgment and review it under the clearly erroneous standard.

[3] The teenagers had run away from foster care. One of the teenagers and his mother had previously lived upstairs in Mother's residence.

home, he observed one of the teenagers look through the window blinds, yell, and then run to the back of the home. Shortly thereafter, X.M., wearing only a diaper, opened the door and let Officer Duffy into the home. X.M. informed Officer Duffy that his parents were not at home.

[4] Once inside Mother's residence—which did not have electricity and which Officer Duffy described at trial as "dirty," "smoky," "haz[y]," "st[i]nk[y]," and so cluttered that he could only walk on "a designated track"—the officers began to search for the teenagers. Tr. at 10. As they searched the main floor, the officers discovered D.M. asleep in a crib, dressed only in a diaper and wrapped in a large pile of blankets.

[5] As the officers searched, they heard noises emanating from the home's basement. Aware of the report of a stolen firearm and concerned for officer safety, Officers Duffy and Allen called for backup. When backup arrived, a search of the home's basement revealed the teenagers, who were hiding with a gun, and a large quantity of stolen goods. In plain view, the officers also found drugs and drug paraphernalia in the home, including a water bong in Mother's bedroom that field tested positive for marijuana.

[6] Officers detained the two teenagers and contacted Holly Kirstan, a Family Case Manager with the DCS, regarding X.M. and D.M. After Kirstan arrived, but before she could enter, Mother returned confused and angry. Police had been at Mother's home for approximately thirty-minutes when Mother arrived. Mother stated that she had left the home to attempt, unsuccessfully, to get her

electricity turned back on, which the power company had shut off due to approximately $900 owed in arrearages. She indicated that she did not leave the children unattended but had left them with her cousin. Her cousin later corroborated this, and he stated that he had left the children with the two teenagers, unaware that they had committed any crimes.

[7] When Mother talked with the officers, she denied that the drugs and paraphernalia found in the home belonged to her. Instead, she claimed that the items belonged to the teenage boys. However, Mother appeared impaired. Thus, the DCS asked Mother to take a drug test, but she refused.

[8] The DCS did not remove the children from Mother's home on April 9 "on the condition that the DCS would be following up the next day." *Id.* at 42. Instead, Kirstan created a Safety Plan for Mother to follow in caring for her children. Mother, X.M., and D.M. then left with relatives, whom Mother had called.

[9] Sylvia Nowakowski, a Family Case Manager with the DCS, attempted to follow up with Mother on April 10 and April 11 but was initially unsuccessful. She could not reach Mother and discovered from Mother's relatives that Mother had left town and had left her children in her relatives' care. Further, Nowakowski could not get a consistent answer regarding Mother's whereabouts, so she detained X.M. and D.M. After the DCS had detained the children, Nowakowski finally reached Mother on the phone. Mother explained

that she was with a relative in Marion, Indiana. Mother stated that she would text her current address to the DCS, but she never did.

[10] On April 15, 2014, the DCS filed a petition alleging that X.M. and D.M. were CHINS,[4] and the juvenile court held an initial hearing that same day. After the hearing, the court found that remaining in Mother's home would be contrary to the health and welfare of the children, and it authorized the DCS to continue to detain the children and to place them into protective custody. The DCS then entered a referral for Mother to participate in supervised visitations with her children. Nowakowski also continued to meet and work with Mother.

[11] Mother was mostly cooperative with Nowakowski. She would participate in scheduled meetings, and she agreed to submit to drug screenings. However, seven of Mother's eight drug screenings indicated the presence of drugs or prescription medications for which Mother did not have a prescription, and some of those screenings occurred on days that Mother had visitation with her children. Mother also freely admitted to using heroin on one occasion, to regular use of methamphetamine, and to an addiction to Lortabs. And, in an interview with the DCS, X.M. stated that, in addition to "brown cigarettes out of a cigarette box," Mother smoked a pipe. Appellant's App. at 13. Further, X.M. disclosed that "his mommy sometimes gave herself shots . . . on her waist." *Id.* (quotation marks omitted). X.M. knew that Mother kept needles on

---

[4] The Appellant's Appendix contains only documents related to X.M. The Appellant's Brief indicates that this is because the filings for X.M. and D.M. are identical with the sole exception of the identity of the child.

top of the home's refrigerator, and he relayed that "[M]ommy said they are bad." *Id.* (quotation marks omitted).

[12] Nowakowski determined that Mother needed drug treatment and referred her for a substance abuse assessment, which is necessary for treatment, at Centerstone Behavioral Center. Despite scheduling the assessment three different times, Mother never completed the assessment. Mother cancelled her first appointment and simply did not show up to the latter two.

[13] Mother's attendance at supervised visitations with her children, conducted by Ireland Homebased Services, was inconsistent but did improve over time. Mother was frequently late to visitations and missed three visitations in May. This resulted in outbursts by both X.M. and D.M. Once, X.M. hit himself in his head and yelled, "Why does [M]ommy do this to me?"[5] And D.M. frequently cried and said, "Mommy, [M]ommy, where's [M]ommy? Where's [M]ommy?" Tr. at 31.

[14] When Mother did participate in visitations with her children, the environment was often tumultuous. As McDonald explained:

> At the beginning [of visitation, Mother] always tries to be very loving[,] and she gives hugs and kisses and smiles at [X.M. and D.M.], but as the visits progress and the boys' behavior becomes more difficult to deal with, she becomes less and less positive and she—her visual cues, her verbal cues, that she's getting stressed out and it's running

---

[5] McDonald also noted that X.M.'s behavior worsened over time and that he "has a lot of anger." Tr. at 32.

her fingers through her hair or biting her lip or the look in her eyes or things she'll say. It just becomes a stressful environment.

*Id.* at 32-33. McDonald also reported that Mother had yelled and cursed at the children during visitations.

[15] The juvenile court conducted three fact-finding hearings regarding the DCS's CHINS petition over June and July, and, on July 29, it entered an order adjudicating X.M. and D.M. CHINS. In relevant part, the court's order stated:

> 1. On April 9th, 2014[,] the Bedford Police Department went to the mother's home trying to locate two male juveniles that were wanted for theft of a gun and several other items[,] as well as for runaway. After knocking, the officer observed one of the juveniles peek through the blind and yell. Several minutes later, a small child in just a diaper ([X.M.]) opened the door and let the officers in the home. The wanted juveniles were found in the home with a large amount of stolen property, which was being stored in the basement of the home. The officers also located [D.M.] sleeping in his crib[,] wearing only a diaper[] but wrapped in a large pile of blankets. No one else was in the house, which at the time had no heat, had a strong odor o[f] smoke and[,] according to the officer[,] had things everywhere with only a track to walk through.

> 2. The mother arrived home 30 minutes later saying she had been trying to get the electricity turned back on and that she had left her children with her cousin, which was verified through testimony[;] however, the evidence showed he had left the children with the two juveniles.

> 3. Also found in the home that day were two glass methamphetamine pipes, a marijuana pipe, a bag of marijuana, rolling papers[,] and a water bong. The mother stated these were not hers. She was asked to submit to a drug screen that day but refused.

4.  The children were not detained that day[;] however, after further investigation and being unable to contact the mother, the children were detained from the grandfather's home on April 11th, 2014.

5.  The mother submitted to a series of drug screens prior to the hearing in this matter.  Of those screens admitted into evidence, 7 of the 8 were positive for various substances[,] including[] hydrocodone, amphetamine, methamphetamine[,] and oxycodone.

6.  The mother testified that she did not use in the presence of the children but may have used the day before having them in her care at times.

7.  The court notes that a single instance of drug usage outside the presence of the child is not sufficient to support a CHINS determination, *see Perrine v. Marion Cnty. Office of Child Servs.*, 866 N.E.2d 269 (Ind. Ct. App. 2007)[;] however, here[,] we have an ongoing drug problem that shows the court that the mother cannot provide appropriate care for the children and that her behavior seriously impairs and endangers the children.

8.  Further, although on the day of the ["]incidents["] that le[d] to the eventual detention of the children, the mother thought she was leaving the children in appropriate care with her cousin, the factors of having drug paraphernalia, stolen property[,] and wanted juveniles in a home with no electricity added to a dangerous situation in which a toddler is left opening the door to a stranger.

9.  Even if the [DCS] did not prove by clear and convincing evidence the statutory factors had been met . . . on th[e] day [the children were detained], a parent's situation at the time a CHINS petition is filed is not the only relevant factor.  The trial court should also consider the situation of the parent at the time of the fact-finding.  *Montgomery v. Marion Cnty. Office of Family & Children*, 863 N.E.2d 413 (Ind. Ct. App. 2007).  Based on the situation as a whole, the department has proven by clear and convincing evidence that the children at issue are in need of services that they are not receiving and are unlikely to be provided

or accepted without the coercive intervention of the court. The mother needs help with her drug problem and[,] until she clearly has control of that[,] she places her children in a situation in which they are endangered by her inability to make appropriate decisions regarding their care.

Appellant's App. at 50-51 (emphases added) (citations corrected). This appeal ensued.

## Discussion and Decision

[16] Mother contends that the juvenile court erred when it adjudicated her children CHINS. Indiana Code Section 31-34-1-1 provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. "A CHINS adjudication focuses on the condition of the child." *N.L. v. Ind. Dep't of Child Servs.* (In re N.E.), 919 N.E.2d 102, 105 (Ind. 2010). "[A] CHINS adjudication does not establish culpability on the part of a particular parent." *Id.* "Said differently, the purpose of a CHINS adjudication is to protect children, not punish parents." *Id*. at 106.

[17] The DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. I.C. § 31-34-12-3; *Davis v. Marion Cnty. Dep't of Child Servs.*

(In re M.W.), 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). When reviewing the sufficiency of the evidence to support a CHINS adjudication, we consider only the evidence favorable to the judgment and the reasonable inferences raised by that evidence. *In re M.W.*, 869 N.E.2d at 1270. This court will not reweigh evidence or judge witnesses' credibility. *Id.* A CHINS adjudication "may not be based solely on conditions that no longer exist," but the court should "consider the [family's] situation at the time the case is heard by the court." *S.S. v. Ind. Dep't of Child Servs.* (In re R.S.), 987 N .E.2d 155, 159 (Ind. Ct. App. 2013).

[18] Moreover, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. Ind. Trial Rule 52(A); *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). In our review, we first consider whether the evidence supports the factual findings. *Menard*, 726 N.E.2d at 1210. Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. T.R. 52(A). While we defer substantially to findings of fact, we do not do so to conclusions of law. *Menard*, 726 N.E.2d at 1210. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable

inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999).

[19] At the outset, although not addressed by the parties, we note that the juvenile court applied an incorrect legal standard in its order adjudicating the children as CHINS; the court applied the clear and convincing evidence standard to the facts when the DCS had the burden only to prove that X.M. and D.M. were CHINS by a preponderance of the evidence. *Davis*, 869 N.E.2d at 1270. "The 'clear and convincing' standard is an intermediate standard of proof" that is less rigorous than beyond a reasonable doubt but more demanding than the preponderance of the evidence. *R.Y. v. Ind. Dep't of Child Servs.* (In re G.Y.), 904 N.E.2d 1257, 1260 n.1 (Ind. 2009) (citation omitted). The standard does not require proof that the facts "are certainly true[,] . . . almost certainly true[,] or . . . true beyond a reasonable doubt." *Id.* But proof by clear and convincing evidence is "greater than a burden of convincing you that the facts are more probably true than not." *Id.* While a trial court's application of an incorrect legal standard can make its decision clearly erroneous, here, when the juvenile court applied the more demanding clear and convincing evidence standard to the facts presented, it necessarily found that the DCS had met its burden by a preponderance of the evidence. Therefore, the trial court did not err on that basis.

[20] With respect to the substance of the juvenile court's findings and conclusions, Mother asserts that the court's findings that Mother's "substance abuse problem resulted in serious endangerment to D.M. and X.M.s mental and physical

health are contrary to law, without support by sufficient evidence in the record, and are therefore clearly erroneous." Appellant's Br. at 5. Mother argues that her substance-abuse problems did not endanger her children at all, and she blames any endangerment that the children faced on "the intervening criminal behavior of the juveniles who entered her home with drugs, paraphernalia, and stolen property," which she "could not have anticipated." *Id.* We cannot agree.

[21] First, the juvenile court's findings are not contrary to law. Mother cites this court's decision in *Perrine* for the proposition that "additional proof of actual endangerment beyond evidence of drug usage outside the presence of a child" is needed "to support a CHINS determination." Appellant's Br. at 9. However, the situation here is markedly different than that present in *Perrine*.

[22] Here, in contrast to *Perrine*, Mother denied using drugs in the presence of her children, but the evidence most favorable to the judgment, at the very least, supports the reasonable inference that Mother did, in fact, use drugs in the presence of her children. *See* 866 N.E.2d at 276. In X.M.'s interview with the DCS, he stated that he had seen Mother smoke a pipe and give herself shots on her waist. Further, unlike in *Perrine*, Mother admitted to multiple instances of drug use outside the presence of her children, not just one. *See id.* Indeed, Mother admitted that she was addicted to Lortabs, and she tested positive for the presence of controlled substances seven times. Finally, and in any event, the juvenile court found additional evidence of endangerment beyond Mother's drug usage: The court noted the presence in the home of drug paraphernalia,

the runaway juveniles, and stolen goods, and it cited the home's lack of electricity to support its reasoning. The court also recognized Mother's "inability to make appropriate decisions regarding [her children's] care," which it attributed to her drug problem. Appellant's App. at 51.

[23] Thus, we must also reject Mother's argument that she could not foresee the runaway juvenile's intervening criminality. In essence, the juvenile court found that the presence of the runaway juveniles in Mother's home resulted from Mother's poor decision making, which, in turn, was attendant to her substance abuse. The evidence supports this conclusion, and Mother's arguments to the contrary request that we reweigh the evidence, which we will not do.

[24] We therefore hold that sufficient evidence supports the juvenile court's findings, and its findings support its conclusions. The evidence indicates that Mother had a severe drug problem, which affected her decision making and, as a result, the children's wellbeing. The evidence demonstrates that the children lived in a dirty home, which contained drugs and drug paraphernalia but had no heat. Mother had approximately $900 in arrearages owed on her electric bill, and, as a result, the electric company refused to reconnect electricity to her home. Thus, the children lived in a home without heat, but they were clothed only in diapers when police arrived. This evidence supports the juvenile court's determination that X.M. and D.M. are CHINS, and the court's judgment is not clearly erroneous.

[25] Affirmed.

Mathias, J., and Bradford, J., concur.