## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 28 2016, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

J.L. and L.L.,
Children in Need of Services,

Q.L.

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

June 28, 2016

Court of Appeals Case No.
49A02-1511-JC-2017

Appeal from the Marion Superior
Court

The Honorable Marilyn Moores,
Judge

The Honorable Beth Jansen,
Magistrate

Trial Court Cause Nos.
49D09-1508-JC-2440
49D09-1508-JC-2441

**Bailey, Judge.**

# Case Summary

[1] Q.L. ("Mother") appeals the trial court's order adjudicating twins J.L. and L.L. (collectively, "Children") as Children in Need of Services ("CHINS"). She presents the sole issue of whether the court's findings of fact and conclusions thereon are clearly erroneous. We affirm.

# Facts and Procedural History

[2] Mother gave birth to Children in fall 2009 in her hometown of Kalamazoo, Michigan.[1] Children were born prematurely and hospitalized for several days. J.L. had clubfoot, and L.L. had a kidney disorder. Over the years, physicians at several Michigan hospitals and medical facilities saw Children for various conditions. Michigan Child Protective Services ("CPS") became involved when Children were born, but Children were not permanently removed from Mother's care. Mother has had "a lot of CPS history" since Children's birth. (Tr. 89.)

[3] Sometime in 2011, Mother and Children lived in Detroit with a man named Johnny Sims ("Sims"), who Mother presented to Children as their father.[2] In

---

[1] Mother has two other children: W.L., born in 2004 when Mother was a minor, and D.L., born in 2014. Neither child is involved in this case. However, shortly after his birth, Mother brought W.L. to Indianapolis, and Mother and W.L. became wards of the State of Indiana. W.L. was placed in foster care while Mother resided in behavioral healthcare facilities and group homes. Eventually Mother's parental rights were terminated, and W.L. was adopted. Mother returned to Michigan.

[2] Children's biological father is not involved in their lives, and DCS could not locate him. He is not a party to this appeal.

2011, Mother and Sims were involved in a domestic violence incident, after which Sims locked Mother and Children in a bedroom for a few days. Mother and Children then moved back to Kalamazoo. In spring 2015, J.L. attempted suicide at school, which Mother believed was due to J.L.'s strained relationship with Sims. **(App. 42-44.)** Mother has maintained contact with Sims.

[4] In July 2015, Mother and Children traveled to Indianapolis to visit Mother's friends. On August 11, 2015, James Mohr ("Mohr"), a property manager at an Indianapolis apartment complex, was checking the swimming pool area for unauthorized guests when he saw J.L. curled in a fetal position at the bottom of the pool's deep end. J.L. was not moving and no one appeared to be supervising him, so Mohr dove in, pulled J.L. out, and began resuscitation efforts. A bystander called 9-1-1. Mother, who was not present when Mohr rescued J.L., returned to the pool around the time the paramedics arrived. J.L. was taken to Riley Hospital to recover.

[5] The Marion County Department of Child Services ("DCS") was called to the hospital to investigate. Family Case Manager Olyvia Hoff ("FCM Hoff") of the fatality and near fatality team interviewed Mother and Children. She also spoke with Mother's Michigan CPS caseworker and hospital staff in Indianapolis and Michigan. Riley Hospital staff members expressed concerns for Mother's current mental health. Mother has a history of mental health diagnoses, including depression, anxiety, and bipolar disorder. FCM Hoff removed Children from Mother's care due to instability in housing and income,

concerns about Mother's mental health, and the lack of supervision leading to J.L.'s near-drowning.

[6] On August 14, 2015, DCS filed a verified petition alleging that Children were CHINS. **(App. 32.)** The court held a fact-finding hearing on October 2, 2015. On October 28, 2015, the trial court entered written findings of fact and conclusions thereon and granted the petition. **(App. 93.)** The court ordered Mother to participate in home-based case management, complete parenting and mental health assessments, and follow all recommendations. **(App. 99.)**

[7] Mother now appeals the trial court's determination that Children are CHINS.

# Discussion and Decision

[8] For the trial court to adjudicate a child a CHINS, DCS must prove three elements: (1) the child is under the age of eighteen; (2) one of eleven statutory circumstances – codified in Indiana Code sections 31-34-1-1 to -11 – exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (citing *In re. N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)). "The CHINS statute is intended to protect children who are 'endangered by parental action or inaction'; a court need not 'wait until a tragedy occurs to intervene.'" *In re S.A.*, 15 N.E.3d 602, 608 (Ind. Ct. App.

2014) (quoting *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009)), *trans. denied*.

[9]     A CHINS proceeding is a civil action, and thus the State must prove by a preponderance of the evidence that a child is a CHINS. *In re. N.E.*, 919 N.E.2d at 105 (citing Ind. Code § 31-34-12-3). In reviewing a CHINS adjudication, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re K.D.*, 962 N.E.2d at 1253. We consider only the evidence that supports the court's decision and the reasonable inferences drawn therefrom. *Id.*

[10]    The trial court entered findings of fact and conclusions thereon, and thus our review is governed by Indiana Trial Rule 52(A). *In re S.A.*, 15 N.E.3d at 607. We apply a two-tiered standard of review: first we consider whether the evidence supports the factual findings, and then whether those findings support the court's judgment. *Id.* We will not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings of fact are clearly erroneous when there are no facts in the record to support them. *Id.* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* "We accord substantial deference to the trial court's findings of fact but not to its conclusions of law." *Id.*

[11]    No statute expressly requires formal findings in a CHINS fact-finding order. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Where, as here, a trial court enters findings and conclusions on its own motion, we apply the two-tiered standard of review to the issues covered by the findings. *Id.* However, we review all

remaining issues under the general judgment standard, under which a judgment may be affirmed on any legal theory supported by the evidence. *Id.*

## *Findings of Fact*

[12] Mother challenges fourteen of the trial court's factual findings, arguing that they are not supported by the evidence.

[13] First Mother challenges the court's finding that she has been "somewhat transient and has been living in many different places after she was no longer a ward of Marion County DCS." (App. 94.) DCS presented evidence that Mother lived with her Mother, Father, other relatives, and Sims at different times and in different cities over the years, primarily in Michigan. At the time DCS became involved with Children, Mother had been "staying" in Indianapolis for over a month (Tr. 57) and planned to travel to Memphis in the future. The court's finding that Mother's housing was "somewhat transient" was supported by the evidence.

[14] Mother then challenges several of the court's findings related to domestic violence and its impact on Children. Specifically, she disagrees with the court's characterization of her as "a victim and an aggressor of domestic violence" (App. 94) and the court's findings that (1) she lacks insight into the damaging effects of domestic violence on children, (2) she expressed a desire to move back in with Sims, and (3) she continues to struggle with domestic violence.

[15] At the fact-finding hearing, Mother described a domestic violence incident in which she hit Sims in the face after he threw a cup of ice at her. **(Tr. 36-37.)**

She also stated that he attempted to "play wrestle" with her, but she seriously fought back when her "motherly instinct kicked in that hey, you've got to fight for your life." (Tr. 37.) Afterwards, Sims locked Mother and Children in an upstairs room for a few days. **(Tr. 37.)** In 2015, J.L. attempted suicide at school, which Mother believed was a result of his relationship with Sims. Mother has continued to see Sims since the domestic violence incident, drives a van provided by Sims, referred to Sims as Children's father during the fact-finding hearing, and last had a romantic encounter with Sims in late 2014. As to Mother's future plans to live with Sims, she testified "I haven't chose [sic] to move back in yet." (Tr. 42.) We cannot say the trial court's findings about the domestic violence component of Mother's seemingly-ongoing relationship with Sims and about her understanding of the impact of domestic violence on Children were clearly erroneous.

[16] Mother also challenges the court's finding that she "lacks an understanding of boundary issues in that she misconstrues relationships and constantly embraces new men into her life." (App. 94.) Mother testified that she came to Indianapolis to visit friends she made "from being a ward of the State and the different facilities and nurses and doctors there." (Tr. 51.) Mother also testified about several relationships with men over the years, including Children's biological father, Sims, D.L.'s father, a "gentleman friend" Mother was visiting when J.L. nearly drowned (Tr. 55), and a man who had apparently rented her an apartment in Memphis. We think the court's finding about Mother's

friendships and relationships was a reasonable inference to draw from Mother's testimony; therefore, the finding was supported by the evidence.

[17] Mother next challenges the trial court's finding that she "acknowledges that she was not in the pool area when her son almost drowned and she continues to demonstrate an inability to know what is good for her children." (App. 94.) At the fact-finding hearing, Mother testified that she let Children into the pool area, realized that she had forgotten towels, and left the pool area while Children were inside. **(Tr. 56-57.)** Mohr testified that no one appeared to be supervising J.L. when he first noticed J.L. at the bottom of the pool. The trial court's finding that Mother was not in the pool area and inadequately supervised Children is supported by the evidence.

[18] Mother also challenges the court's finding that she is not taking medication for her mental health diagnoses, including depression, anxiety, and bipolar disorder. **(App. 94.)** Mother testified that she had a current prescription for Vistaril to take "as needed." (Tr. 66.) The trial court questioned Mother about taking prescribed medication:

> THE COURT: …So, are you currently taking meds for your mental health diagnosis or not?
>
> [MOTHER]: No.
>
> THE COURT: Did you take a pill today?
>
> [MOTHER]: No.

(Tr. 60.) The court's finding that mother is not taking medication for her mental health diagnosis is supported by the evidence.

[19] Mother next challenges the court's finding that she is "unable/unwilling to meet [Children's special and developmental] needs and even basic needs as a result of her own chaotic life." (App. 94.) Mother testified at length about Children's special needs and the various service providers involved in Children's care. However, Mother also explained that Children's doctors in Michigan stopped providing them with care after Mother and Children failed to show up for medical appointments. **(Tr. 30-31.)** Children's foster mother in Indiana reported that K.L. was diagnosed with asthma at an initial doctor's visit and was wetting the bed. The doctor referred K.L. to a urology specialist. Children's foster mother also sought counseling and educational assistance for K.L. due to K.L.'s behavior at home and school. Despite Mother's testimony that she came to Indianapolis to get second opinions on Children's medical needs, she did not do so during the month she had been in Indianapolis. Mother has moved between several family members' homes during Children's short life, creating instability in Children's lives and disrupting their access to care. The trial court's finding that, due to Mother's instability, Mother was either unable or unwilling to provide Children with appropriate care to meet their special and basic needs was supported by the evidence.

[20] Mother also challenges the court's finding that "Mother has only seen [Children] three times since the inception of this matter and the Court finds that she does not make her children a priority even though she acknowledges living

in a local hotel for the past few weeks." (App. 94-95.) DCS removed Children on August 12, 2015. Mother then returned to Michigan, but came back to Indianapolis for a mediation on September 15. At the October 2, 2015 fact-finding hearing, Mother stated that she had been staying in a local hotel since September 15. Mother testified that she had seen Children three times during the seven weeks they had been removed. Based on this testimony, the trial court's finding that Mother had not prioritized visitation with her Children was not clearly erroneous.

[21] The trial court found that DCS removed Children due to Mother's "mental health as indicated in medical records and by Riley [Hospital] Staff; instability of living situation as verified by Mother herself and a lack of supervision which resulted in her child nearly drowning." (App. 95.) Mother argues this finding is unsupported by the evidence because DCS's allegations contained in the CHINS petition were not admitted into evidence. However, FCM Hoff testified about the reasons for Children's removal **(Tr. 90-91)**, and the court's finding is supported by FCM Hoff's testimony.

[22] Mother then challenges the trial court's finding that Children's caseworker "has seen a need for continuing involvement and coercive intervention of the Court." (App. 95.) The parties agree that the caseworker did not explicitly testify about a continued need for involvement or coercive court intervention, although she testified about DCS's recommended services. Nevertheless, a finding that merely recites the substance of witness testimony is not a finding of fact. *Parks v. Del. Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007).

The trier of fact must adopt the witness testimony before a "finding" is considered a finding of fact. *Id.* The inclusion of statements that are not findings should be considered "mere surplusage." *Id.* (quoting *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind. 1981)). Thus, to the extent the trial court misstated the caseworker's testimony, the misstatement is harmless error because the trial court did not adopt the caseworker's testimony as fact.

[23] Mother also argues that the trial court erred in finding that Mother needs services to maintain her mental health and address parenting and domestic violence issues. Mother argues that the finding was erroneous because Mother was already receiving mental health services in Michigan, was involved with Michigan CPS, and testified that she would re-engage with services when she returned there. In other words, Mother argues that she does not need services because she could access them in another state. As the State points out, "Mother's own argument acknowledges her need for services." (Appellee's Br. 30.) Moreover, the evidence establishes that Mother has a mental health diagnosis for which she is not taking prescribed medication, failed to supervise Children (leading to J.L.'s near drowning), and appears to maintain a relationship with a man with whom she has a history of domestic violence and whose involvement in J.L.'s life apparently led to J.L.'s suicide attempt. The evidence thus supports the trial court's finding that Mother needs services to address mental health, parenting, and domestic violence issues.

[24] Finally, Mother challenges two of the court's findings concerning her other children not involved in this case. As to W.L., she argues there was no

evidence that he was adopted while she was a ward. W.L.'s adoption date is not in the record. However, Mother testified: "They just took my baby and I was still left as a ward of the State." (Tr. 17.) Mother's testimony appears to support the court's finding. As to D.L., Mother argues that no evidence establishes that he has been adopted. Indeed, Mother testified only that she intended to place D.L. for adoption, D.L. was currently in her sister's care in Michigan, and her sister had "power of attorney" for the child. (Tr. 49.) The court's finding about D.L.'s adoption status is not supported by the evidence; however, the error is harmless because the record substantially supports the crucial part of the factual finding: that D.L. is in his aunt's care. Further, Mother fails to explain how an inaccurate statement of D.L.'s precise legal relationship to Mother would support a reversal of the trial court's CHINS adjudication as to Children.

[25] With the exception of the erroneous, yet harmless, finding about D.L.'s adoption status, the trial court's findings of fact were not clearly erroneous.

### *Conclusions Thereon*

[26] We turn to Mother's argument that the findings do not support the court's conclusion that Children are CHINS.

[27] DCS alleged that Children were CHINS under Section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. The trial court concluded simply that Children "are children in need of services and DCS has proved the petition alleging same by a preponderance of the evidence." (App. 95.)

[28] The trial court's findings establish the following facts: Children were five years old at the time of the fact-finding hearing. J.L. nearly drowned in a swimming pool while Mother failed to supervise him. J.L. also attempted suicide, apparently due to Sims's presence in his life; however, Mother continues to maintain a relationship with Sims. Despite her knowledge and belief that Children had special medical and developmental needs, Mother was not providing Children, in particular K.L., with necessary medical care while in Indianapolis. Further, Children's medical treatment in Michigan was terminated due to missed appointments. Mother has not provided stable housing for Children. Mother has a history of mental illness and a current mental health diagnosis, but is not taking prescribed medication. Mother's

"concerning behaviors" (App. 95) and "rambling and confusing" testimony at the fact-finding hearing also caused the trial court to have "concerns about [Mother's] mental health." (App. 94.) Mother has acknowledged being "overwhelmed." (App 95.)

[29] The trial court's findings of fact therefore support the conclusion that Children are under eighteen, Children's physical or mental conditions are seriously impaired or endangered as a result of Mother's neglect, and Children need care and treatment that they are not receiving and is unlikely to be provided without court intervention.

[30] Mother contends, however, that the findings do not support the judgment because the court did not enter a specific finding that the care and treatment Children need is unlikely to be provided or accepted without coercive court intervention. Because no statute requires special findings in a CHINS fact-finding order, the absence of this specific finding is not error. *In re S.D.*, 2 N.E.3d at 1288. Accordingly, to determine whether coercive court intervention was necessary, we review the whole record under the general judgment standard. *Id.* In this case, there was ample evidence that Mother was not providing care and treatment she was aware Children needed. Further, Children's DCS caseworker testified about Mother's "overly aggressive" attitude during their conversations. (Tr. 109.) Mother had visited Children only three times in the seven weeks they had been removed. From this evidence, the trial court could reasonably infer that Mother might not voluntarily participate in recommended services designed to help her provide

Children with the necessary care and treatment. The evidence thus supports the conclusion that the coercive intervention of the court is necessary.

[31] The trial court's findings support the conclusion that Children are CHINS.

# Conclusion

[32] The trial court's order adjudicating Children CHINS was not clearly erroneous.

[33] Affirmed.


Bradford, J., and Altice, J., concur.