**FOR PUBLICATION**

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Dept of Child Services
Indianapolis, Indiana

**FILED**

May 22 2012, 9:26 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF: V.H., Minor Child, Child in Need of Services, | ) |
| | ) |
| | ) |
| J.H., Mother, | ) |
| | ) |
|     Appellant-Respondent, | ) |
| | ) |
|         vs. | ) |
| | )   No. 49A02-1110-JC-947 |
| | ) |
| INDIANA DEPARMENT OF CHILD SERVICES, | ) |
| | ) |
| | ) |
|     Appellee-Petitioner. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary K. Chavers, Judge Pro-Tempore
The Honorable Julie Cartmel, Magistrate
Cause No. 49D09-1105-JC-17511

**May 22, 2012**

**OPINION – FOR PUBLICATION**

**BAKER, Judge**

Here, a single mother of two teenage daughters was faced with a situation that is, unfortunately, not that uncommon to many parents of teenagers. On two occasions, the mother's sixteen-year-old daughter, who outweighed her by about thirty pounds, became physically aggressive with her during an argument. To diffuse the situation, the mother called the police, who then reported the incidents to the Department of Child Services (DCS). The DCS investigated, and although it was determined that the daughter had been the aggressor in both incidents, the DCS filed a petition alleging that the daughter was a Child in Need of Services (CHINS) because of the mother's failure to provide her with necessary care. The juvenile court granted this petition and ordered the mother to participate in services that were unrelated to the CHINS adjudication. We hold that the adjudication and the participation decree are erroneous.

J.H. (Mother) appeals the juvenile court's order adjudicating her sixteen-year-old daughter, V.H., to be a CHINS. Mother argues that the DCS failed to prove that V.H. is a CHINS because there is no evidence that V.H. has suffered abuse or neglect or that the coercive intervention of the court is necessary for her to provide V.H. with the help that she needs to address her behavioral issues. Mother also contends that the juvenile court erred by ordering her to complete services unrelated to the CHINS adjudication. Concluding that the juvenile court erred by adjudicating V.H. to be a CHINS and by

2

ordering services in the participation decree that were unrelated to the adjudication, we reverse the adjudication and vacate the participation decree.

FACTS

Mother has two daughters, V.H., born on May 10, 1995, and I.H., born on April 19, 1998. Mother is a single parent and V.H.'s father is deceased. Since 2008, Mother has worked full-time in a clerical position for the Family and Social Services Administration, Division of Family Resources and recently completed her master's degree in business.

V.H. has had behavioral problems for the past twelve years; however, her behavior did not become physically violent until she reached puberty. Mother has worked with V.H.'s school for years, and V.H. has been identified as eligible for special education services under the Individuals with Disabilities Education Act (IDEA). Additionally, V.H. has an Individualized Education Plan (IEP), which is the product of a collaborative effort between Mother and the school to address V.H.'s behavioral and educational needs. V.H. was participating in the online PLATO program at school, which is a "curriculum that is designed just for each individual child." Tr. p. 34.

On March 27, 2011, when V.H. was fifteen years old, Mother took her to Gallahue Mental Health Services for an initial assessment. On March 31, 2011, V.H. was diagnosed by Dr. Nathan Larson with Oppositional Defiant Disorder, which is characterized by a "[p]attern of negativistic/hostile/defiant behavior" that has "lasted at least 6 months" and V.H. "often loses temper, often argues with adults, often actively

3

defies or refuses to comply with rules, often deliberately annoys people, often blames others for his/her mistakes or misbehavior, is often touchy or easily annoyed, is often angry and resentful, is often spiteful or vindictive." Ex. A. p. 5. V.H.'s treatment plan was individual and group therapy. V.H. attended three group sessions before the DCS became involved.

On April 16, 2011, Mother contacted the police when V.H. became physically aggressive during an argument. Mother is a petite woman, weighing about 105 pounds, and V.H. outweighs her by approximately thirty pounds. DCS Family Case Manager, Daniel Sparling, was contacted after receiving a report, which "alleged that there was a physical altercation involving both [Mother] and [V.H.] and that [V.H.] was a victim of physical abuse." Tr. p. 7. Sparling discussed the incident with Mother, who explained that she and V.M. had had an argument over a computer cord and that during the course of the argument, V.M. attempted to get Mother's computer from her room. When Mother tried to block her, V.M. began pushing her. Mother pushed back but claimed she did not remember choking V.H. Eventually, V.H. took the keys to Mother's vehicle and turned on the engine until the vehicle ran out of fuel.

During Mother's conversation with Sparling, she indicated that V.H. was not being cooperative about attending group counseling. Sparling ended the first assessment by providing Mother with "some informal resources" but "had not closed that investigation out when [he] got the second report yet." Tr. p. 9.

The DCS received a second report on May 1, 2011. The second report alleged that there had been another physical altercation between Mother and V.H. and that V.H. had been arrested and placed at Lutherwood Emergency Shelter by the arresting officer. When Mother was contacted to pick up V.H., she could not be reached. When Sparling discussed these allegations with Mother, she stated that there had been another physical altercation between her and V.H. and that she had called the police. Mother stated that she was not planning to pick up V.H. at that time because she wanted V.H. to be involved in "some form of counseling service before returning to her home." Tr. p. 10.

V.H. returned to Mother's home at the end of May, but the DCS investigation "substantiated abandonment as a form of neglect against [Mother] because she did not pick up [V.H.] from Lutherwood." Id. at 12. Nevertheless, the DCS investigation "clearly indicated that in these altercations that [V.H.] was the aggressor." Id. at 13.

On May 4, 2011, the DCS filed a petition alleging that V.H. and I.H. were CHINS because of Mother's neglect. On July 7, 2011, DCS moved to dismiss the CHINS petition as to I.H., which was granted.

The DCS proceeded on the allegation that V.H. was a CHINS because of neglect. At the CHINS factfinding hearing on August 11, 2011, and at the CHINS dispositional hearing on October 6, 2011, Mother denied the allegation, arguing that V.H. was not a CHINS because she was providing for V.H.'s needs without the coercive intervention of the court and that she was not unwilling or unable to provide necessary food, clothing, shelter, medical care, education, or supervision of V.H. In the alternative, Mother argued

that if the juvenile court determined that V.H. was a CHINS, that the court make the finding under Indiana Code section 31-34-1-6 (CHINS 6), which applies when a child is a danger to themselves or others without a finding of parental abuse or neglect.

At the August 11 factfinding hearing, Sharon Bowland, a DCS family case manager, testified that the family required homebased counseling and either counseling or mental health treatment for V.H. Bowland also testified that the DCS had homebased counseling in place and that the DCS had ordered counseling at Gallahue, but did not know if it had started. More particularly, Bowland testified as follows:

> THE COURT: What about the individual counseling for [V.H.]?
>
> A. I don't know for sure if she, how many appointments have been set up. I know that that when I talked with mom before they had not happened yet. I got a call from Gallahue that they had the family on record and that they would be setting up appointments.
>
> THE COURT: You can't, okay. You don't know for sure if they've ..
>
> A. Right.
>
> THE COURT: ..started yet?
>
> A. Right.

Tr. p. 21. Bowland also recounted a visit during which she discovered that although the home was "appropriate," there were no beds for V.H. and I.H. and that Mother was "relieved" that DCS could help her acquire beds for her daughters. Id. at 18.

Mother testified about taking V.H. to Gallahue before the DCS's involvement. Mother acknowledged that V.H. had stopped attending group counseling, but testified

6

that after the DCS became involved, she tried to get V.H. signed up again at Gallahue. Mother was unsuccessful, insofar as "[V.H.] was a CHINS case that her family case manager would have to schedule that because they wanted to make sure they got paid." Tr. p. 33. Mother explained that although Medicaid had initially paid for V.H.'s group counseling, because she was a CHINS case, "they wanted to make sure the funds came from the other side." Id.

On cross-examination, when Mother was pressed about needing DCS services because she wanted a psychological evaluation performed on V.H., she responded as follows:

> Okay, at this point we've been dealing with DCS since May. Mr. Beals was supposed to initiate the Gallahue back in June. This never happened. We got switched to a new family case manager as of July the 8th. Called Mrs. Bowland several times requesting the evaluation, the Gallahue situation questioning whether the referral had been sent, when it had been sent, who sent it. I also called the supervisor to ask her also pertaining to the Gallahue referral.
>
> ***
>
> They, no one ever called me back.

Tr. p. 49-50.

In the juvenile court's conclusions of law, which were contained in its order adjudicating V.H. a CHINS, it determined that:

> 6. [V.H.] is a child in need of services because [her] physical or mental condition is seriously impaired or seriously endangered as a result of [Mother's] inability to supply [V.H.] with necessary medical care and supervision to adequately address [V.H.]'s behavior issues. Despite [Mother]'s individual efforts to help [V.H.] through the years, [Mother] has

7

been unable to provide [V.H.] with adequate medical and/or mental health care and supervision which has resulted in [V.H.]'s behavior worsening rather than improving.

7. Services are necessary to ensure [V.H.]'s care and to provide her with treatment that she needs, which, as of the day of trial, [V.H.] was not receiving and were unlikely to be provided or accepted without the coercive intervention of the court. The reasons for MCDCS' involvement with the family have not been remedied in that even though [V.H.] has been returned to [Mother]'s care, homebase services are ongoing and no recommendation for successful closure has occurred. Furthermore, [V.H.] has not completed treatment with Gallahue and she has yet to have her psychological evaluation, the recommendations of which, if any, are unknown. Finally, [Mother], by herself and without assistance, is unable to ensure that compliance with any and all recommended treatment for [V.H.] will occur. Accordingly, the coercive intervention of this court is necessary.

Appellant's App. p. 67-68.

The dispositional hearing was held on October 6, 2011, with a different magistrate presiding. At the beginning of the hearing, Mother requested a continuance based on the fact that the transcript had not been prepared from the August 11 factfinding hearing. Mother explained that the transcript was necessary because when she was asked about wanting a psychological evaluation for V.H. through the DCS, Mother was told that it would take three to six months to get a psychological evaluation. Tr. p. 60-61. Consequently, Mother contacted her primary care physician and got V.H. a psychological evaluation on her own, and was "just waiting on the final report that is due back the 17th of this month." Tr. p. 61.

The juvenile court failed to see the necessity of the transcript from the factfinding hearing, noting that "it's not clear to the Court why the transcript would affect

recommendations but mom's here to make any additional recommendations or to dispute any of DCS' [sic] recommendations. . . . DCS is recommending standard services." Id. These included:

> maintain regular contact with the case manager, notify criminal or arrest charges, case manager visits to see the home, written authorizations to release information, remain in the county, maintain suitable housing and source of income, prohibiting any illegal use of drugs, participate and successfully complete home-based counseling as arranged by the family case manager, complete a parenting assessment and all recommendations, meet the child's medical and mental health needs, designate a disciplinarian and ensure that [V.H.] completes a psychiatric evaluation which mother reports is already completed and that she follows any recommendations of that evaluation, including any individual therapy for her.

Tr. p. 69-70. Mother was also ordered to reimburse the DCS $25 a week. Mother now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental rights of parents in directing the care, custody, and control of their children. In re T.H., 856 N.E.2d 1247, 1250 (Ind. Ct. App. 2006). However, these rights are limited, and the State has the authority under its parens patriae power to intervene when necessary to protect the health and safety of children. Id.

As with the termination of parental rights, the purpose of a CHINS adjudication is to protect children rather than to punish parents. In re N.E., 919 N.E.2d 102, 106 (Ind. 2010). To that end, a juvenile court need not wait until a tragedy occurs to intervene. In

9

re A.H., 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). To be sure, a child is a CHINS when the child's condition demonstrates that a child needs care, treatment, or rehabilitation that the child is not receiving, and is unlikely to be provided or accepted, while in the care of his or her parents, without the coercive intervention of the juvenile court. Ind. Code § 31-34-1 et seq.

Here, because the juvenile court entered findings of fact and conclusions of law, we apply a two-tiered standard of review. Parmeter v. Cass Cnty. Dep't of Child Servs., 878 N.E.2d 444, 450 (Ind. Ct. App. 2007). We first consider whether the evidence supports the factual findings and then whether the findings support the judgment. Id. While we defer substantially to findings of fact, we do not do so to conclusions of law. Id.

## II. Sufficiency of the Evidence

Although Mother attacks particular findings of fact, she essentially argues that the evidence was insufficient to support the juvenile court's determination that V.H. was a CHINS. The crux of Mother's arguments is that the DCS failed to prove that she neglected V.H. or that the coercive intervention of the court is necessary, inasmuch as she has been providing for V.H.'s needs, including treatment for her behavior problems. Indiana Code section 31-34-1-1- provides:

A child is a [CHINS] if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

10

child with necessary food, clothing, shelter, medical care, education, or supervision; and

    (2)    the child needs care, treatment, or rehabilitation that:

        (A)    the child is not receiving; and

        (B)    is unlikely to be provided or accepted without the coercive intervention of the court.

DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. I.C. § 31-34-12-3.

In this case, V.H. had an IEP through school, describing how she would access the general education curriculum and the special education services needed to participate in school. Mother was involved in developing V.H.'s IEP. Tr. p. 34. Likewise, because of V.H.'s behavioral problems, a Behavior Intervention Plan was developed through school and Mother played an active role its development as well. Ex. C.

After V.H.'s behavior problems escalated, Mother took V.H. to Gallahue on March 27, 2011 for an initial assessment. On March 31, 2011, V.H. was diagnosed with Oppositional Defiant Disorder, and her treatment plan included individual and group therapy. Ex. A. p. 5. V.H. attended three group sessions before the DCS became involved on April 16, 2011, after Mother called the police because V.H. had become physically aggressive with her.

Before the DCS could make a finding regarding the April 16 incident, Mother called the police a second time on May 1, 2011, after V.H. had become physically

11

aggressive with her. V.H. was arrested and taken to Lutherwood, and Mother admittedly refused to pick up V.H. until V.H. had been offered some counseling services. Tr. p. 10.

DCS filed a CHINS petition on May 4, 2011. Thereafter, Gallahue told Mother that she would need to work through her family case manager to schedule appointments for V.H. When the family case manager, Bowland, was questioned at the August 11, 2011 factfinding hearing about scheduling V.H.'s appointments with Gallahue, she did not know if they had been scheduled or when they would be scheduled. Tr. p. 21.

Under these facts and circumstances, it is apparent that Mother, who is a working single parent, was addressing V.H.'s behavioral issues. This is something for which we should applaud parents rather than condemn them through coercive action. Indeed, even after the DCS became involved, Mother contacted her primary care physician on her own and scheduled V.H. for a psychological evaluation after she learned that the DCS could not schedule one through Gallahue for three to six months. Tr. p. 60-61. In light of this evidence, we cannot agree that V.H. needs care, treatment, or rehabilitation that she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. Accordingly, we reverse the juvenile court's order adjudicating V.H. as a CHINS.

### III. Participation Order

Mother also appeals the juvenile court's participation order, arguing that it required her to accept services and satisfy requirements unrelated to the CHINS adjudication. Because we have reversed the juvenile court's order adjudicating V.H. a

12

CHINS, we also vacate the participation order that resulted from the October 6, 2011 dispositional hearing. However, even if we had affirmed the juvenile court's CHINS adjudication, the participation order would have been vacated, insofar as there were procedural errors made and requirements ordered that were unrelated to the CHINS adjudication.

Initially, we note that a different magistrate presided over the dispositional hearing. The magistrate did not have the benefit of the transcript from the factfinding hearing, a detail which troubled Mother leading her to move for a continuance until the transcript was completed and available. The juvenile court failed to see the relevance of the transcript because the DCS was only recommending "standard services." Tr. p. 61. We cannot agree with this determination, inasmuch as the evidence that was produced at the factfinding hearing should have influenced the services and requirements that were ordered in the participation order. Accordingly, the transcript from the factfinding hearing was relevant at the dispositional hearing, particularly in light of the fact that the dispositional hearing was presided over by a different magistrate.

In a related matter, the juvenile court ordered services that were labeled as "standard services." Tr. p. 61. In A.C. v. Marion County Department of Child Services, this court vacated portions of a participation decree because it utilized boilerplate language requiring the mother to undergo services where there was no evidence in the record to support the need for those services. 905 N.E.2d 456, 464-65 (Ind. Ct. App. 2009). We cautioned that:

13

The use of boilerplate language can make the citizenry cynical about the requirements necessary to achieve the goals of a CHINS adjudication. Although the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence. . . . Indeed, forcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunification, but potentially, the termination of parental rights.

Id.

Here, Mother was ordered to permit the DCS family case manager to make unannounced visits "to ensure the safety of the child" when V.H.'s safety was not an issue. Appellant's App. p. 88. Indeed, V.H. was determined to be the aggressor in both altercations with Mother. Tr. p. 13. Similarly, Mother was ordered to maintain suitable housing and a source of income when her home was determined to be appropriate and she has been and remains employed full-time. Id. at 18. Mother was also ordered to put into place a protection plan to protect V.H. from abuse or neglect from any person when there is no evidence that V.H. has suffered abuse or neglect from anyone. Mother was ordered to reimburse the DCS $25 a week for services, even though Mother had to schedule V.H.'s psychological evaluation because the DCS failed to do so in a timely manner. In short, Mother was ordered to complete requirements and accept services that were not supported by the record because the DCS recommended only "standard services." Tr. p. 61. We discourage the juvenile courts from using such boilerplate requirements.

The judgment of the juvenile court is reversed and remanded with instructions to

14

vacate the participation order.

KIRSCH, J., and BROWN, J., concur.