## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 12 2016, 8:22 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the matter of: E.G. and H.G., | February 12, 2016 |
| A.B. (Mother), *Appellant-Respondent,* | Court of Appeals Case No. 49A02-1506-JC-488 |
| v. | Appeal from the Marion Superior Court |
| The Indiana Department of Child Services, *Appellee-Petitioner.* | The Honorable Danielle Gaughan, Magistrate |
| | The Honorable Marilyn Moores, Judge |
| | Trial Court Cause No. 49D09-1410-JC-2570 49D09-1410-JC-2571 |

**Vaidik, Chief Judge.**

# Case Summary

[1] A.B. (Mother) appeals the juvenile court's adjudication of her minor children, E.G. and H.G., as children in need of services (CHINS). The sole issue for our review is whether the evidence supports the juvenile court's determination that the children were CHINS pursuant to Indiana Code Section 31-34-1-1. Concluding that the evidence does not support the juvenile court's determination, we reverse the CHINS adjudication.

# Facts and Procedural History

[2] Mother has two daughters, E.G. born on March 19, 2010, and H.G., born on May 30, 2014. A few months after H.G.'s birth, Mother was hospitalized and told one of the nurses, "[y]ou need to sacrifice your children as well as I did." Tr. p. 75. After Mother's mother contacted DCS with concerns about her daughter's mental health, DCS case manager Kevin Kapp interviewed Mother at the hospital. Mother was sluggish and sedated. She denied that her "sacrifice" statement referred to killing her children.

[3] When Kapp interviewed Mother a week later, after her release from the hospital, Mother appeared more coherent. She explained that her prior health condition might have been related to her thyroid or to post-partum depression, which she suffered from after the birth of her first child. Mother told Kapp that she had been prescribed Risperdal.

[4] At the end of October, Kapp received a report that Mother had been hospitalized again. When Kapp went to the hospital to interview Mother, she was sedated and told Kapp that she had stopped taking her medicine. Kapp described Mother as "zombie-like." Tr. p. 49.

[5] A few days later, DCS filed a petition alleging that both children were CHINS. At the initial hearing, Mother acknowledged that she was not able to care for her children at that time because her medication left her "groggy [and] very unable to focus." Tr. p. 20. Additional testimony revealed that doctors were working on adjusting the dosage of the medication. The juvenile court placed the children with their father, who had previously had the children in his care and had a good relationship with them. Mother was granted supervised parenting time.

[6] In early December, Mother's tongue became swollen, and she was sluggish. The doctor realized that Mother was having an allergic reaction to the medication prescribed for her post-partum condition. The doctor discontinued the medication, and Mother suffered no more symptoms of post-partum depression.

[7] At the April 6, 2015, fact-finding hearing on the CHINS petition, Adam Tinker, the DCS case manager that was assigned to Mother's case in December 2014, testified that Mother had been participating in a home-based case management program as well as home-based therapy and had cooperated with all services. She had stable employment in the security department at Menard's and stable

housing that included utility assistance. Tinker testified that DCS planned to transition the children back into Mother's home and that he had no concern that placing the children back in Mother's home would create anxiety or stress for her. According to Tinker, both Mother and Father were "deeply involved in their children's li[ves]." Tr. p. 61.

[8] Home-based therapist Kristina Shannon, who had been meeting with Mother weekly since December 2014, testified that she and Mother had developed a mental health and personal safety plan for Mother should her mental health symptoms return. According to Shannon, Mother has support from family and could obtain immediate assistance should she need it. Shannon had no concern that children's return to Mother's home would trigger her mental health issues or cause her stress.

[9] Last, Mother testified that she had not taken any medication since December 2014. She had stable housing and employment, and the children had begun overnight visits. She had family available to watch her children if their father was out of town, and she had resources available should she need help. When asked what she meant seven months before when she mentioned sacrificing her children, Mother explained that she meant to, "put everything to a side and put God above everything . . . and having God in your household and teaching your kids how to love for God." Tr. p. 76.

[10] At the conclusion of the hearing, the juvenile court adjudicated the children to be CHINS. Specifically, the court explained as follows:

> Here's what's worrying me about this and that is . . . we have
> some mental health issues . . . seems to be centered around post-
> partum. But, and I know you have a safety plan in place, but
> these children are so young. You're doing everything right. You
> really are. You got a job, you got a home. You're sweet as you
> can be and I think you love your children very much. But I feel
> like, since this was initiated, and you were at that state where you
> were when it started that I need to see you through this transition
> to ensure the safety of the children.

Tr. p. 77-78. Mother appeals the adjudication.

# Discussion and Decision

[11]     Mother's sole argument is that there is insufficient evidence to support the

juvenile court's adjudication that her children are CHINS. Not every

endangered child is a CHINS permitting the State's *parens patriae* intrusion into

the ordinarily private sphere of the family. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind.

2014). Rather a CHINS adjudication under Indiana Code section 31-34-1-1

requires three basic elements: 1) that the parent's actions or inactions have

seriously endangered the child; 2) that the child's needs are unmet; and 3)

perhaps most critically, that those needs are unlikely to be met without State

coercion. *Id.* In full, the statute provides as follows:

> A child is a [CHINS] if before the child becomes eighteen (18)
> years of age:
>
> (1) the child's physical or mental condition is seriously
>     endangered as a result of the inability, refusal, or neglect of
>     the child's parent, guardian, or custodian to supply the child

> with necessary food, clothing, shelter, medical care,
> education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that
>
> (A)the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive
> intervention of the court.

The final element guards against unwarranted State interference in family life, reserving that intrusion for families who lack the ability to provide for their children, not merely where they encounter difficulty in meeting their children's needs. *Id.*

[12] DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. *V.H. v. Indiana DCS,* 967 N.E.2d 1066, 1072 (Ind. Ct. App. 2012) (citing Ind. Code § 31-34-12-3). When reviewing a CHINS determination, we neither reweigh the evidence nor judge witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence favorable to the judgment and the reasonable inferences raised by that evidence. *In re M.W.*, 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007).

[13] Here, our review of the evidence reveals that at the time of the April 2015 hearing, Mother had cooperated with all recommended services. She had not suffered from any post-partum or mental health issues - or taken any medication for these conditions - since December 2014. She also had a plan

should her symptoms return. Mother had stable employment and housing, and both the DCS case manager and Mother's therapist testified that they had no concerns that placing the children with Mother would create anxiety and stress for her.

[14] This evidence, even viewed most favorably to the judgment, cannot reasonably support an inference that Mother was likely to need the court's coercive intervention for any reason. A CHINS finding should consider the family's condition not just when the case was filed, but also when it was heard. *S.D.*, 2 N.E.3d at 1290.

[15] A CHINS adjudication may have long-lasting collateral consequences for a family. *Id.* at 1284. Accordingly, the intrusion of a CHINS adjudication must be reserved for families who cannot meet their needs without coercion. *Id.* The facts of this case do not justify subjecting Mother to State compulsion. *See id*. We therefore reverse the juvenile court's adjudication.

[16] Reversed.

Bailey, J., and Crone, J., concur.