## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 22 2017, 9:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Special Assistant to Indiana Public Defender
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of L.G., A Child in Need of Services,

J.C., Father,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 22, 2017

Court of Appeals Case No. 52A05-1610-JC-2454

Appeal from the Miami Circuit Court

The Honorable Timothy P. Spahr, Judge

Trial Court Cause No. 52C01-1606-JC-65

**Kirsch, Judge.**

[1] J.C. ("Father") appeals the juvenile court's adjudication finding his minor son, L.G. ("Child") to be a Child in Need of Services ("CHINS"). He raises the following restated issue: whether the evidence is sufficient to support the CHINS adjudication.

[2] We affirm.

## Facts and Procedural History

[3] At the time that the present CHINS case was filed, Child was sixteen years old, and his mother was deceased. Child had been the subject of a prior CHINS case that was filed in August 2014 and closed in late 2015 or early 2016. During that case, Child was placed at Youth Opportunity Center ("YOC") for approximately a year. When that CHINS case closed, Child was formally placed in Father's care.

[4] Father worked the third shift, such that he had to find supervision for Child during that time period. Father states that, at some point after the closure of the prior CHINS case, he reached an informal agreement with Indiana Department of Child Services ("DCS") that, while he was at work, Child would be supervised by Child's aunt ("Aunt") at her residence.

[5] On June 14, 2016, DCS received a report that Child was at Aunt's home and that a methamphetamine lab had been discovered there by police. Child was taken to the hospital for a medical evaluation, and he tested positive for

methamphetamine and marijuana. At the hospital, DCS family case manager Miranda Sipe ("FCM Sipe") spoke to Child, who told her that he was aware of the "illegal activities" happening at Aunt's home and that he used methamphetamine and marijuana. *Tr.* at 52. He indicated to FCM Sipe that he and Father have "a bad relationship." *Id.* at 53. DCS contacted Father, and he came to the hospital. Father told FCM Sipe that he was unaware that Child used drugs.

[6] While Father was at the hospital, Father and Child were having a phone conversation, and FCM Sipe was present with Child during the call. Father was expressing his anger about the whole situation, and FCM Sipe could hear that Father was cursing. She saw that Child was becoming upset, so she took the phone away from Child, told Father that "he needed to stop or we were gonna have to ask him to leave," and she ended the phone call. *Id.* At some point, Father told FCM Sipe that he could not take Child home that evening because he had to be at work and could not miss it, as he had just started the job and did not want to lose it. DCS detained Child and placed him at YOC.

[7] On June 15, 2016, DCS filed a petition alleging Child to be a CHINS, based in part on the facts that Child was found in Aunt's home, where methamphetamine was present, and that Child tested positive for methamphetamine and marijuana. The petition also alleged that Child "disclosed" to DCS that "Father is aware of his drug use." *Appellant's App.* at 17. At the initial and detention hearing, Father testified that he was "at his wit's end with [Child]" and that he was "done" with Child. *Tr.* at 64. Father

acknowledged that he had "trouble" managing Child's behaviors and that he did not want placement of Child with him at that time. *Id*. at 65-66. The juvenile court maintained Child's removal and placement and set the matter for a fact-finding hearing.

[8] On July 9, 2016, Child ran away from his placement at YOC and was still missing at the time of the August 10, 2016 fact-finding hearing, at which FCM Sipe and Father testified. FCM Sipe described that her involvement began when DCS was notified on June 14 that Child was found in Aunt's home where methamphetamine was present. FCM Sipe went to the home, and then to the hospital, where Child tested positive for methamphetamine and marijuana. FCM Sipe interviewed Child at the hospital, and he told her that he was aware of the methamphetamine lab being operated at the home. FCM Sipe contacted Father, who came to the hospital. Father told FCM Sipe that he was not aware of Child's drug use. FCM Sipe testified to witnessing what Child had described as a "bad relationship" between Child and Father, explaining that she was in the room with Child during his phone conversation with Father and that she "removed" the phone from Child and "hung up on" Father because he was cursing at Child and upsetting him. *Id*. at 53-54. With regard to Child running away from YOC, FCM Sipe stated that Child ran away with another juvenile and that DCS had received some information from that other juvenile's father, which information DCS had shared with law enforcement.

[9] Father testified that, although Child's mother had died in the fairly-recent past, "His mother did not raise him, I did," and that he had had custody of Child

since Child was four years old. *Id*. at 58. Father stated that during a meeting with DCS, which occurred after the prior CHINS case was closed, he and DCS agreed that Aunt's house was an acceptable location for Child during the time that Father worked. He testified that he had been to Aunt's home and had not witnessed drugs or other activity to cause him concern and believed it was safe. Father stated that he "absolutely" did not know that Child was using methamphetamine or smoking marijuana. *Id*. at 61. For some period of time after the closure of the prior CHINS case, Father took Child to a facility called Four County for treatment, but he quit taking Child because they "kept jerking around [and] didn't give [Child] his medications." *Id*. at 61-62. Father also testified that, because Child could not attend school unless he was on his medications, Child "end[ed] up skipping like three weeks of school." *Id*. at 61. However, according to Father, the school did not notify him that Child had missed school "until three weeks later." *Id*. Father acknowledged that he never visited Child during the two or three weeks that he was at YOC before running away, but explained that he was waiting to visit because he believed Child needed to think about his actions, given that Child had recently spent a year or so at YOC during the prior CHINS case, and not long after that was completed, Child was "smoking meth and smoking weed[.]" *Id*. at 66. Father was "very mad" and "very disappointed." *Id*. at 67. Because Father had indicated to the court that DCS had in some fashion approved of Child being supervised by Aunt, the juvenile court asked FCM Sipe about whether DCS formally placed Child with Aunt, and she stated she was not aware of any such placement. *Id*. at 57.

[10]   At the conclusion of the August 10 fact-finding hearing, the juvenile court adjudicated Child a CHINS.[1]  The juvenile court expressed concern that, in less than six months after the last CHINS was closed, Child was using drugs, Father and others had difficulty controlling Child's conduct, Child had missed several weeks of school, and Child was off his medications.  The juvenile court also noted that Child had not contacted Father after running away from YOC.

[11]   Child participated in the September 2016 dispositional hearing by telephone from The Kinsey Center, a family and child shelter in Kokomo, Indiana. Father appeared for hearing, in person and with counsel.  Father agreed that Child needed inpatient treatment, and while he acknowledged that he had difficulty managing Child's behaviors, Father asked that Child initially be placed with him and then Child would start treatment.  Father acknowledged that Child never contacted him before or after he ran away from YOC, until he was arrested in Missouri, but Father urged that "it's because he knows I'd turn him in so of course he ain't gonna contact me." *Tr*. at 39.  DCS expressed concern about placing Child with Father because Child still needed "more constant supervision" than Father could provide as a single working father.  *Id*. at 13.  DCS noted that the concerns and issues present at the initial hearing – that Child needed substance abuse treatment and treatment for "underlying issues that he may still have dealing with his mother's death and other things" –

_____

[1] According to DCS, Child was "located in Missouri in late August and returned to Indiana on or about August 26, 2016." *Appellee's Br*. at 8.

had not yet been addressed at all. *Id.* at 13-14. John Walker, a representative from the Miami County CASA program, testified, "I don't think he should go home yet" as Child needed to be in a placement where he would get the treatment "that he desperately needs." *Id.* at 16. DCS indicated it was looking to place Child at a facility that was "secure enough to keep him safe and also provide him with the substance abuse and other therapy that he needs."[2] *Id.* at 19.

[12] The juvenile court opined that the evidence reflected that Child needed "some pretty intensive attention [and] treatment," noting that Child had tested positive for methamphetamine at age sixteen and exhibited difficulty or unwillingness to follow rules. *Id.* at 22. In its September 2016 dispositional order, the juvenile court ordered placement of Child with DCS and ordered Father and Child to participate in services.[3] Father now appeals.

---

[2] DCS indicated that it was not asking for reimbursement. *Tr.* at 20.

[3] We note that Father expressed concern to the juvenile court that DCS failed to stay in communication with him: "I could never get a hold of them. They never return my calls, they never let me know they found my kid, they never let me know he ran away. They never let me know nothing." *Tr.* at 25. He inquired, "[H]ow am I supposed to do things when they don't even contact me, at all, and they got my phone number." *Id.* at 26. The juvenile court offered, "If you're not getting a response from the family case manager, you can contact one of the supervisors[,]" and if that does not accomplish anything, then bring the matter "to [your attorney's] attention[,]" and the juvenile court urged Father to attend all child and family team meetings in order to stay informed. *Id.* at 27. We remind all parties of the responsibility to remain accessible and in communication.

# Discussion and Decision

[13] CHINS proceedings are civil actions, and therefore, it must be proven by a preponderance of the evidence that a child is a CHINS as defined by statute. Ind. Code § 31-34-12-3; *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015) (citing *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)), *trans. denied*. When we review a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* We consider only the evidence that supports the juvenile court's decision and the reasonable inferences drawn therefrom. *Id.* at 39-40.

[14] When a juvenile court's order contains specific findings of fact and conclusions thereon, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014) (citing *In re T.S.,* 906 N.E.2d 801, 804 (Ind. 2009)). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the judgment. *Id.* Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.* While a reviewing court gives substantial deference to a juvenile court's findings of fact, it does not apply the same deference to its conclusions. *In re V.H.*, 967 N.E.2d 1066, 1072 (Ind. Ct. App. 2012).

[15] Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove:

(1) the child is under the age of 18;

(2) one or more particular set or sets of circumstances set forth in the statute exists; and

(3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.*, 919 N.E.2d at 105. Here, the juvenile court adjudicated Child to be a CHINS pursuant to Indiana Code section 31-34-1-1, which provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Therefore, this statute requires "three basic elements:  that the parent's actions or inactions have seriously endangered the child, that the child's needs are

unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. Ct. App. 2014).

[16] In the present case, Father asserts that "DCS failed to present sufficient evidence to support the juvenile court's finding that [Child]'s physical or mental condition was seriously endangered as a result of Father's (in)actions." *Appellant's Br*. at 8. Father appears to challenge Finding No. 11, which stated:

> Based upon the evidence presented to the Court, it is clear that the child's physical or mental health is seriously endangered as a result of the inability and neglect of the Father to supply the child with medical care, education, and supervision. Additionally, the child needs care, treatment, and rehabilitation that he has not been receiving and that is unlikely to be provided or accepted without the coercive intervention of the Court.

*Appellant's App*. at 39. The crux of Father's argument is that "[Child]'s difficulties are not the result of Father's actions or inactions" and that "DCS failed to show that the problems . . . are due to Father's neglect." *Appellant's Br*. at 7-8.

[17] For instance, Father asserts that DCS did not prove that he failed to provide the Child with adequate supervision and that, as a result, Child's mental or physical health was endangered, as found in Finding No. 11. He argues that the evidence presented was that Father believed the Aunt's home was safe, and he did not know about the illegal drug activity. While Father testified that he believed Aunt's home was safe and that he was not aware of illegal drug activity at the home, the evidence presented was that there was a

methamphetamine lab at the home, and that Child knew about illegal drug activity occurring there, and that he tested positive for methamphetamine and marijuana. Father had placed Child there, which, according to Father was pursuant to a prior informal arrangement reached with DCS, although FCM Sipe was not aware of it. As Child's custodial parent, Father bore the responsibility of knowing what was happening in the home where he left Child to be supervised. We thus reject Father's claim that DCS failed to show that Father did not provide Child with adequate supervision, and that, as a result, Child's mental or physical health was endangered.

[18] Father also challenges the juvenile court's determination in Finding No. 8 that "Father was not taking the child to services and the child was not receiving his medications[.]" *Appellant's App*. at 38. The evidence presented established, and Father acknowledges, that he quit taking Child to Four County: "I took him out of it, why? [They were] not giving him his medicine. [They were] not doing nothing for him, why keep going?" *Tr*. at 61-62. Father suggests, however, that he was "under no obligation" to take Child to therapy "as the [prior] CHINS case had been closed." *Appellant's Br*. at 10. The issue, however, is not whether he was under a legal obligation; the issue is whether, as the juvenile court found, Father was not taking the Child to services and whether Child, while in Father's custody, was not getting his needed medications. The evidence supports the juvenile court's Finding No. 8.

[19] Finding No. 10 determined that "Father admitted that the child had missed approximately three weeks of school prior to the end of the school year this

spring." *Appellant's App*. at 38. Father does not dispute that Child missed the weeks of school; rather, he contends that "DCS failed to show what action or lack thereof on the part of Father led to [Child] not attending school." *Appellant's Br*. at 10. We disagree. The evidence presented was that Father unilaterally quit taking Child to Four County, and Child was not getting his medications. As a result, as Father explained, "[Child] couldn't go to school because he wasn't on his meds so he was flipping out at school and nobody wanted to do nothing, nobody wanted to give him his meds and then he ends up skipping like three weeks of school." *Tr*. at 61-62. From the evidence presented, the juvenile court could reasonably find that Father's action or inaction led to Child not attending school.[4]

[20] A CHINS adjudication is a determination that a child is in need of services and is unlikely to receive those services without the court's intervention; it is not a determination of parental fault. *In re N.E.*, 919 N.E.2d at 105. "The purpose of the CHINS adjudication is to 'protect the children, not punish parents.'" *In re K.D.*, 962 N.E.2d 1249, 1255 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d at 106). "The process of the CHINS proceeding focuses on 'the best interests of the child, rather than guilt or innocence as in a criminal proceeding.'" *Id.*

---

[4] In his brief, Father does not does not identify or refer us to precisely which findings he asserts are not supported by the evidence, but based on his arguments, we infer that he challenges Finding Nos. 8, 10, and 11. To the extent that Father does not challenge the rest of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by trial court resulted in waiver of argument that findings were clearly erroneous), *trans. denied*.

[21] Here, the evidence presented showed that Child, at age sixteen, was using methamphetamine and marijuana at his Aunt's home, where Father was taking Child to be supervised while Father was at work. This occurred just months after a prior CHINS proceeding involving Child was closed. Illegal drug activities, including operation of a methamphetamine lab, were occurring at Aunt's home, where Child stayed while his Father was at work. Child had a strained relationship with his Father, who shared at the initial hearing that he was at his "wit's end" and could not manage Child's behavior. *Tr.* at 64. Father testified that for a period of time he had been taking Child for his treatment or therapy at Four County, but eventually quit taking Child because Four County was "jerking around" and not giving Child his medications. *Id.* at 61-62. Father acknowledged that Child had missed several weeks of school, which Father attributed to the fact that Child was not on his medications. Child ran away from YOC and was still on the run at the time of the August 10 fact-finding hearing. Child did not contact Father while at YOC or contact him after he ran away, with Father hearing from Child only when he was arrested more than a month later in Missouri. The evidence presented illustrated that Child: (1) was unwilling or unable to follow rules, including those of his Father; (2) needs to be on medication, which he was not taking or getting; (3) needs substance abuse treatment; and (4) needs therapy for other issues likely related to his mother's death. DCS expressed concerns about these matters at the beginning of the CHINS case, and no progress was made on any of them.

CHINS statutes do not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Based on the evidence presented, we find that DCS proved by a preponderance of the evidence that Child's physical or mental condition was seriously endangered as a result of Father's action or inaction and that Child needed care or treatment that he was not getting and was unlikely to get without coercive intervention of the court. The juvenile court did not err in adjudicating Child to be a CHINS.

Affirmed.

Mathias, J., and Altice, J., concur.