## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 24 2019, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Flora
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of Ar.H. and Ay.H. (Minor Children),

J.H. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 24, 2019

Court of Appeals Case No.
18A-JC-2904

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause Nos.
02D08-1708-JC-589
02D08-1708-JC-590

**Mathias, Judge.**

[1] Father appeals the Allen Superior Court's adjudication of his children, Ar.H. and Ay. H., as Children in Need of Services ("CHINS").

[2] We affirm.

## Facts and Procedural History

[3] K.H. ("Mother") is the mother of A.W., Ay. H., and Ar.H. J.H., ("Father") is the biological father of Ay.H., and Ar.H. On July 17, 2017, police executed a search warrant on the parents' home for Jessica Dunton ("Dunton"), a friend of Mother and Father who had been staying with the family. Dunton was no longer residing in the home; however, law enforcement found the home to be cluttered and dirty, had gnats and flies, and smelled strongly of cat urine. Due to the conditions of the home, law enforcement referred the matter to the Indiana Department of Child Services ("DCS"). DCS Family Case Manager ("FCM") Louise Dietzer ("FCM Dietzer") assessed the matter and, after some discussion, decided that the children would go to their grandparents' home for a few days while the parents followed a detailed plan to clean the home. The home was cleaned by July 25, 2017, and the children returned home on that day.

[4] However, FCM Dietzer believed the parents needed the intervention of the court to assist the family with ongoing maintenance of the improved home conditions and the underlying issue of possible prescription misuse. Tr. Vol. I, p. 64. On August 23, 2017, the court found probable cause that the minor children were Children in Need of Services ("CHINS") and authorized DCS to

file a petition. The court allowed the children to continue residing in their parents' home but also entered provisional orders requiring Mother and Father to submit to a Diagnostic Assessment and follow recommendations, submit to random urinalysis and drug screens as required by DCS, and complete a Medical Evaluation by September 23, 2017 and comply with the recommendations. The court also appointed counsel for Mother and Father. DCS filed an amended CHINS petition on September 12, 2017. On September 18, 2017, the court held another Initial Hearing in which Mother and Father admitted that they were the only parents of A.W., Ay.H., and Ar.H. and lived in the same household.[1] Father indicated he was unemployed and had undergone two months of treatment at an alcohol and drug treatment center in Wabash for opioid addiction in 2012.

[5] Throughout the duration of the CHINS proceedings, both Mother and Father submitted to drug screens and engaged with several service providers including: Paul Bruns ["Bruns"], a licensed clinical addictions counselor who provided services to both parents; Jor-El Gaines ("Gaines"), a mental health therapist who provided services for Father; and Leslie Sammons ("Sammons"), a mental health therapist who provided services for Mother. The court held fact-finding

---

[1] It was established that A.W. has a different biological father. A.W.'s biological father is referenced in the record only to establish that he has not regularly visited A.W., was behind on child support, and was unable or unwilling to provide housing for A.W. As J.H. is not A.W.'s biological father, and Mother does not participate in the appeal, this appeal does not relate to the CHINS finding as to A.W.

hearings on December 7, 2017, March 21, 2018, May 25, 2018, and May 31, 2018.

[6] At the December 7, 2017, fact-finding hearing, Bruns testified that he performed a substance abuse assessment for Father on October 6, 2017. Bruns testified that Father had a prescription for Percocet, which "is . . . basically Vicodin with . . . analgesic added to it." Tr. Vol. I, p. 13. Bruns also testified that people typically take Percocet for pain management. Father had a prescription for Xanax at one time, but this prescription had expired. Mother reported to Bruns that she was prescribed Percocet 10-325s five times a day from December 2007 to the present for endometriosis.

[7] Bruns believed it to be unusual that both Mother and Father had similar prescriptions for two completely different diagnoses, especially since both diagnoses were often treated with something less than an opiate. He was also concerned that both parents seemed to believe that they did not have addictions or a dependence because they had prescriptions. Father also had prescriptions for Keppra 700 and "philly" 50 mg two times daily for seizures. Father was also taking Divalproex at 250 mg three times a day, also for seizures. Father also had a Xanax prescription for 2 mg 3 times per day that had been discontinued in 2016. Father reported a head injury and neurological issues from playing football and a five or six out of ten on the pain scale for chronic pain related to a past wrist reconstruction. Bruns also noted that Father made jerking motions during the initial assessment. Bruns asked if he was cold, and Father indicated he had problems with seizures, but was not having a seizure. Because Bruns

had concerns with drug interactions and the length of time Father had been taking opiates for diagnoses such as tendonitis and arthritis, he requested an independent medical examination. At the time of the fact-finding hearing, he had not received the results of this examination. However, both Mother's and Father's opioid dependence was unquestionable to Bruns. He recommended thirty hours of drug and alcohol treatment consisting of fifteen group sessions for each parent.

[8] FCM Dietzer responded to the initial report. She testified that the home conditions as she observed them on July 17, 2017 were concerning to her. She observed trash and clothing in addition to dirty dishes on the kitchen counter and clothing piled on the laundry room floor eight to ten inches deep. The room where Dunton had been staying was so full of items, people could hardly get into the room. She also observed that the cat litter box had mold in it, and the odor of cat urine was present throughout the house. Cat feces was present in the laundry room. It was difficult for her to navigate through the house, and there were flies and gnats throughout the home. A couch, toys, and trash items were strewn in the side yard. When FCM Dietzer initially assessed the home, Father reported to her that many of the items belonged to their friend who had moved out and that Ay.H.'s fits from his ADHD had messed up the house.

[9] FCM Dietzer observed the children were dressed appropriately, and although there was only a small amount of food in the house, the children did not appear to be malnourished. When she spoke with A.W., she reported that she knew what drugs were from school and that her parents only took their prescriptions.

None of the children reported physical abuse, that the parents were absent for significant periods of time, or other concerning behaviors to the FCM.

[10] FCM Dietzer spent a significant amount of time at the home that day and worked out a plan with the parents so that the children did not have to be removed. They agreed to a detailed safety plan outlining which rooms would need to be cleaned by what time and for two separate re-inspections of the home while the children stayed with their grandparents. She observed the conditions of the home had improved when she visited again two days later. FCM Dietzer gave approval for the children to move back in on July 25.

[11] FCM Dietzer was also concerned with parents' use of prescription medications. She also testified that Father initially told her on July 17 that his doctor, Dr. Larry Bledsoe ("Dr. Bledsoe"), had taken him off Xanax because it was believed to interfere with the uptake of pain medication in June of 2017. However, two days later, Father told her that he was taken off the Xanax around December 2016 or January 2017. Mother also indicated to her that the same doctor had prescribed her Percocet five times a day for endometriosis pain. Mother indicated to the FCM that she had been taken off Xanax in June 2017. FCM Dietzer administered a drug screen on her initial visit. Outside of their prescribed medications, Father tested positive for hydrocodone, and Mother tested positive for tramadol. Father appeared shaky. Both parents showed her prescription bottles for the Percocet. They also indicated that they both had medication in other containers but did not show her those other containers.

[12] FCM Dietzer asked both Mother and Father whether they felt that they abused their prescriptions. Father denied that he abused his prescriptions. He also indicated to her that he had been upset by her arrival, so he took some Xanax that was left over from his expired prescription.

[13] FCM Dietzer brought the matter as a CHINS case because she believed she needed the intervention of the court to assist the family with the home conditions and because of what she believed was likely an underlying issue of prescription misuse by both parents. The matter was transferred to permanency worker Joshua Meyer in August 2017, and she has not had contact with the family since that time.

[14] Bridget Lemberg, Lab Director and Toxicologist at Forensic Fluids, testified that Percocet is oxycodone. She testified that someone who takes Percocet would not test positive for hydrocodone, commonly known as Vicodin or Lortab. In her experience, someone would not test positive for tramadol or Xanax for taking Percocet. She also testified that Forensic Fluids uses cut-off levels for therapeutic dosing from the federal registry. She testified that opiates are depressants and can put someone to sleep; however, individuals can build up a tolerance, and because of this, individuals can exhibit side effects differently.

[15] Gaines, a mental health and home-based therapist for Dockside Services, testified regarding the therapy he provided to Father in order to help him reduce his anxiety. He observed Father to be incredibly "antsy" and had a history of

anxiety attacks. Tr. Vol. I, p. 144. He reported that in the past couple of months, Father had recognized the substance abuse issues in his past. Father felt using the opiates was a "horrible situation that's a hassle to him," and he wants to get off the opiates, get back to becoming more independent, and get a job. *Id.* Gaines testified that Father was consistent with therapy and has made significant progress. He agreed that the existence of the DCS matter was causing Father some anxiety. Although he was not a substance abuse counselor, the topic of substance use came up a lot during therapy. He recommended substance abuse therapy, but to his knowledge, Father had not engaged in any.

[16] Sammons, a mental health therapist for Dockside, testified regarding the individual therapy she had engaged in with Mother. Mother has panic attacks at work and believes that it impacts her ability to work. She believed Mother was becoming more receptive to therapy. She recommended a continuation of therapy because she believed Mother could use "more stability under her belt before um trying to do it all on her own." Tr. Vol I, p. 165. Sammons believed Mother needs the most work on challenging negative thoughts as they arise. She had been inside the home for therapy sessions, and she believed the home to be kept to DCS standards. Sammons also recommended substance abuse counseling for Mother and said that Mother had only recently asked how to get started with substance abuse counseling.

[17] Joshua Meyer ("Meyer"), the DCS permanency worker assigned to the matter since August 2017, also testified. He has observed that the home typically had

trash or laundry strewn but remained at minimal standards or above for the duration of the time he was assigned to the matter. He understood from Mother that she had been on Xanax, but that her doctor took her off Xanax, then put her back on it. Meyer felt it was difficult to follow what she was actually prescribed because it kept changing, but Mother never asked to see her prescriptions. He also felt it was tough to follow what Father was prescribed because "[Mother and Father] tested positive for so many different things throughout [the CHINS proceedings]." Tr. Vol. I, p. 189. He reported that neither parent had started substance abuse counseling for which he made a referral on October 24, 2017. Meyer had a conversation with the parents at a Child and Family Team Meeting in February of 2018 about contacting Dockside for a referral for group counseling. He informed them that he had already placed a referral, those referrals do not expire, and that Dockside would need to contact him for a new referral. He has not heard anything from Dockside or the parents regarding a referral for substance abuse therapy since that conversation.

[18] He was aware that the prescribing doctor, Dr. Bledsoe, had submitted a report showing that he had no concerns regarding parents' intake of medications. However, Meyer still had concerns because Mother was drinking alcohol and taking medications for which she did not have a prescription, but he had never personally spoken with Dr. Bledsoe. He agreed that the children had plenty of food, appropriate clothing, and shelter. The school had not reported any behavioral issues. He also did not see any signs of physical abuse or educational

neglect. Meyer believed that the children were "[de]sensitized to a lot." Tr. Vol. I, p. 236.

[19]    Father testified that he requested individual counseling instead of the group counseling for substance abuse because of his anxiety. He testified that he has a prescription for Xanax and had been prescribed Suboxone for a period of time "to try to completely get off of the opiates[.]" Tr. Vol. II, p. 4. He said he "ended up having a very rare and bad reaction to it so I had to get off of it." *Id.* He agreed that, at the time DCS became involved, the conditions of the residence were unacceptable. He also testified that he has Xanax for his anxiety and pain medication because he has had several reconstructive surgeries. He also testified that he had a benign lump on the left side of his skull that is pushing against his brain, for which he is prescribed anti-seizure medication. He testified this seizure disorder interferes with his ability to maintain employment; however, he recently obtained employment building fences. He informed the case worker about this job and showed him his pay stub. This is seasonal work, and he is unsure if he would be able to continue working for this company because there is not much to do besides regular maintenance work during the winter, and Father is unable to drive. Although his physical limitations impair his ability to work, he does not believe these impair his ability to care for his children. He agreed that the services provided helped him address issues, particularly with the therapy. However, he does not believe he needs any counseling for substance abuse. He later said on rebuttal examination that he spoke with Gaines multiple times about group therapy and that he had been

told he needed a new referral. He believed his attorney communicated that to the FCM.

[20] Mother testified that she has maintained clean, safe, and appropriate housing at all times, that she cooperated with the GAL and all FCMs. She also testified that she has refrained from the use of alcohol, illegal drugs, and substance abuse. She has been taking her medications as prescribed. She completed all of the homebased casework and ensured the children took all their medications as prescribed. She had recently had surgery for her endometriosis and was on bed rest. She was also prescribed 5 mg of Percocet as a result of the surgery. She was already on Percocet so she does not remember if she informed the FCM of this new prescription. She said her internal medicine doctor, Dr. Bledsoe, diagnosed her with anxiety. She also said that she was willing to try group therapy, but a referral needs to be made for it.

[21] The court issued its Findings and Conclusions adjudicating the children CHINS pursuant to Indiana Code section 31-34-1-1 in a sixty-five-paragraph order on September 10, 2018. In paragraph 46 of this order, the court noted that it observed a flat affect from both parents. The court further noted that it observed both Mother and Father "nodding off" during the proceedings. Appellant's App. p. 20. Father now appeals.

# Discussion and Decision

[22] In order to adjudicate a child a CHINS, DCS must prove by a preponderance of the evidence that

(1)    the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2)    the child needs care, treatment, or rehabilitation that:

(A)    the child is not receiving; and

(B)    is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1; *In re S.A.*, 15 N.E.3d 602, 608 (Ind. Ct. App. 2014), *aff'd on reh'g*, 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied.*

[23]    A CHINS adjudication focuses on the condition of a child, and whether that child needs services. *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). A CHINS adjudication may not be based solely on conditions that no longer exist. *Id.* The trial court should also consider the parents' situation at the time the case is heard by the court. *Id.* A parent's rights to his or her children are not absolute. *In re S.A.*, 15 N.E. 3d at 611. Acting under its parens patria*e* power, the State may interfere with parental autonomy when "necessary to protect the health and safety of the children." *In re V.H.*, 967 N.E.2d 1066, 1072 (Ind. Ct. App. 2012). A court need not wait until a tragedy occurs before entering a CHINS finding. *In re R.S.*, 987 at 158.

[24]  DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. Ind. Code § 31-34-12-3. In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility for ourselves. *In re S.A.*, 15 N.E. 3d at 607. We consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017).

[25]  "Factual findings are clearly erroneous where there are no facts in the record to support them either directly or by inference." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*. We accord substantial deference to the trial court's findings of fact but not to its conclusions of law. *In re S.A.*, 15 N.E.3d at 607. Any issues not covered by the trial court's findings are reviewed under the general judgment standard, "under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Father has challenged the sufficiency of the evidence supporting the CHINS finding. As such, we engage in a two-tiered standard of review. *In re A.H.*, 913 N.E.2d 303, 305 (Ind. Ct. App. 2009); *Yanoff*, 688

N.E.2d at 1262. We first determine whether the evidence supports the findings, then whether the findings support the judgment. *In re A.H.*, 913 N.E.2d at 305.

[26] Here, the trial court entered detailed findings and conclusions in an eleven-page, sixty-seven paragraph order. Appellant's App. pp. 14–24. In his challenge to the adjudication, Father specifically challenges the findings that, without the continued presence of service providers, the home was likely to deteriorate to its previous condition. He also argues that the trial court appeared to place "great weight on the testimony of Father's therapist, [Gaines], and that of the person who performed the substance abuse evaluation, Paul Bruns" although these individuals were not provided with any information from the prescribing physician. Appellant's Br. p. 14. He also argues that, "[i]f the children were negatively impacted by Father's use of non-prescribed prescription drugs on two occasions, nine and ten months prior to the factfinding, DCS failed to prove they were still negatively affected at the factfinding." Appellant's Br. at 16.

[27] We first turn to Father's argument regarding the weight given to service provider testimony given they were not provided a report from the prescribing physician. The trial court made a finding that the entirety of the report containing the opinion of the primary care physician was not admitted for the court's examination. The trial court also noted the fact that the physician did not testify impacted the weight the court gave to this opinion. The fact that Bruns and Gaines were not provided with information from the prescribing physician was presented at the hearing and therefore available to the trial court when it entered its findings and conclusions. As such, Father's argument

regarding the weight the trial court placed on the testimony of Bruns and Gaines essentially asks us to the re-weigh the evidence, which we cannot and will not do.

[28] Father also argues that since home-based services had been discontinued at the request of the service provider before the conclusion of the factfinding hearing, the trial court erred in finding that the home was likely to deteriorate to its previous condition "without the continued presence of service providers." Appellant's Br. at 14 (citing Appellant's App. p. 23). This argument ignores the court's conclusion that "the condition of the home is a symptom of the underlying mental health issue and drug addiction which has yet to be addressed and thus the home is only at minimal standards but for the intervention of the Court." Appellant's App. p. 23. The trial court entered multiple findings regarding the parents' underlying mental health and drug addiction issues. The trial court also found that the "these proceedings involve issues more complex than the mere presence of a prescribed medication in the system of both Mother and Father." Appellant's App. p. 20. Evidence of both Mother's and Father's significant challenges with anxiety and substance abuse is abundant throughout the record. Moreover, Father was prescribed Suboxone and admitted that he had substance abuse issues. Both Mother and Father were initially resistant to the substance abuse therapy but had recently asked for these services. Although a dispute, or minimally, confusion, exists as to the reason parents had not yet begun the substance abuse therapy at the time of the fact-finding hearing, the parents had not engaged in this therapy that all parties had

sought or recommended for Mother and Father. Father's argument that the cancellation of the home-based services means that the parents were able to maintain a safe home ignores the complexity of the issues and the trial court's conclusions that the parents' unresolved mental health and substance abuse issues were the underlying reasons parents had difficulty maintaining a safe and clean home.

[29] Father argues that by the time of the fact-finding hearing, all of the children's needs were being met by the parents. However, the fact that the needs of the children were met does not mean that the coercive intervention of the court was not needed to meet those needs. Moreover, it ignores the conclusions of the trial court. Here, the trial court made conclusions based on significant evidence that parents had not addressed substance abuse issues and that although the home had remained clean, the children were still impacted by their parents' continued refusal to participate in services related to the substance abuse. The trial court also concluded that the condition of the home was a symptom of the underlying mental health issues and drug addiction, and that without the continued presence of service providers, the home is likely to deteriorate to its previous condition. These conclusions are all supported by substantial evidence and do not constitute clear error.

## Conclusion

[30] Because the evidence supports the conclusions, and because to find otherwise would be to reweigh the evidence, which we cannot do, we affirm the trial court's adjudication of Ar.H. and Ay. H. as CHINS.

Affirmed.

May, J., and Brown, J., concur.